## IN UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**THE UNIVERSITY OF MISSISSIPPI**                                    **PLAINTIFF**
**MEDICAL CENTER**

**VS.**                                    **CAUSE NO.** 3:19-cv-459 CWR-LRA

**SPENCER K. SULLIVAN, M.D.;**
**MISSISSIPPI CENTER FOR**
**ADVANCED MEDICINE, P.C.,**
**LINNEA MCMILLAN;**
**KATHRYN SUE STEVENS, and**
**RACHEL HENDERSON HARRIS**                                    **DEFENDANTS**

### COMPLAINT
### *Jury Trial Demanded*

Plaintiff, The University of Mississippi Medical Center, files this Complaint against Spencer K. Sullivan, M.D., Mississippi Center for Advanced Medicine, P.C., Linnea McMillan, Kathryn Sue Stevens, and Rachel Henderson Harris.

### PARTIES

1.      The University of Mississippi Medical Center ("UMMC") is the health sciences campus of the University of Mississippi and an agency of the State of Mississippi. It is located at 2500 North State Street, Jackson, Mississippi 39216.

2.      Defendant Spencer K. Sullivan, M.D. ("Dr. Sullivan") is an adult resident citizen of Mississippi who resides at 268 Sundial Road, Madison, Mississippi 39110.

3.      Defendant Mississippi Center for Advanced Medicine, P.C. ("MCAM") is a Mississippi for-profit corporation incorporated under the laws of the State of Mississippi with its principal place of business located at 7731 Old Canton Road, Suite B, Madison, Mississippi 39110.

4.      Defendant Linnea McMillan ("McMillan") is an adult resident citizen of Mississippi who resides at 316 Fox Hollow, Canton, Mississippi.

5.      Defendant Kathryn Sue Stevens ("Stevens") is an adult resident citizen of Mississippi who resides at 213 Concord Drive, Clinton, Mississippi.

6.      Defendant Rachel Henderson Harris ("Henderson") is an adult resident citizen of Mississippi who resides at 345 Lake Village Drive, Madison, Mississippi.

JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter and the parties hereto pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the United States, specifically the Federal Trade Secrets Act, 18 U.S.C. §§ 1832, 1836, and 1839 and Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

8.      Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. §1391(b)(1) and (b)(2) because all Defendants reside in this district and/or because a substantial part of the acts, events, or omissions giving rise to the claims and/or a substantial event that caused the injury occurred in this district.

STATEMENT OF FACTS

*The University of Mississippi Medical Center*

9.      UMMC is the only academic health sciences center in Mississippi. It is a teaching hospital that encompasses six health science schools: medicine, nursing, dentistry, health related professions, graduate studies, and pharmacy. It exists to enhance the educational, economic, health-care, social, and cultural foundations of the state, region, and nation. Within this framework, UMMC's mission is to train health-care professionals at the first professional, graduate and postgraduate levels for Mississippi, and to provide the highest level of patient care.

10.     The State of Mississippi, acting by and through the Board of Trustees for Institutions of Higher Learning ("IHL") has authorized, empowered, and directed UMMC to enter into contractual agreements for the employment of all necessary faculty and staff. UMMC enters into employment contracts with physicians through a written agreement called a "Professional Services Addendum" ("PSA").

11.     As a state-funded teaching hospital, UMMC is statutorily required to serve the people of Mississippi. It is required by law to provide not less than fifty percent of its services to indigent persons including qualified beneficiaries of the State Medicaid Program ("Medicaid"). Approximately 80% of UMMC's patients are Medicaid beneficiaries.

12.     Mississippi law requires that all income derived from UMMC's operations be utilized toward the payment of its operating expenses.

*The Blair E. Batson Hospital for Children*

13.     UMMC's Blair E. Batson Hospital for Children ("Batson") is Mississippi's only children's hospital. Batson turns no child away, regardless of ability to pay.

14.     Batson is the only medical facility in the state devoted exclusively to the care and treatment of sick and injured children. Batson provides care to over 150,000 children per year, for everything from emergency care to highly specialized heart and cancer care. It has Mississippi's only Level IV neonatal intensive care unit (NICU), Mississippi's only pediatric intensive care unit (PICU), and Mississippi's only pediatric emergency department. The Eli Manning Children's Clinic delivers healthcare to more than 75,000 Mississippi children, with general pediatricians working alongside pediatric specialists in more than 30 areas of medicine to provide child-focused care, including well-child visits, a vaccination program, and acute care in orthopedics, cardiology, and endocrinology. Batson also operates the Children's Safe Center, a

3

resource for the assessment, investigation, and prosecution of child maltreatment. The Mississippi Children's Cancer Center is the only center in the state providing comprehensive care for children with cancer or blood-related diseases.

15.     Approximately 212,000 (29%) Mississippi children live in poverty, and Mississippi ranks 49th amongst all states for children in poverty. Approximately 80% of Batson's patients are Medicaid beneficiaries.

16.     Batson's physician's are organized into divisions based on specialty such as surgery, neurology, and hematology/oncology. Some divisions generate more revenue than others. State law requires revenue generated by one clinic be used to support the operating expenses of the whole, which includes supporting clinics that generate less revenue, or to build outreach clinics in areas with limited access to pediatric specialists, or in other ways to promote Batson's overall mission of providing education, research, and high quality medical care to Mississippi's most vulnerable children.

17.     Batson carries out its mission by employing physicians who specialize in more than thirty areas of pediatric medicine. Batson nurtures each physician's practice and provides office space, clinical facilities, administrative staff, nursing staff, medical equipment, laboratories, research opportunities, mentorship, patients, and all other necessary components of a successful medical practice.

18.     As a condition of employment at UMMC, all employees must comply with numerous policies and procedures that protect the use of sensitive information. Those policies and procedures are contained within numerous publications provided to all employees. These include the Faculty and Staff Handbook, the Systems Security Acknowledgment, Non-Disclosure Agreement, Information Policy, and Compliance Plan (collectively "UMMC

Information Security Policies"), all of which are incorporated herein by reference. All employees receive yearly training on acceptable and unacceptable uses of sensitive, proprietary, and confidential information such as protected health information, patient data, patient lists, and financial data. Those policies and procedures apply to all employees, whether physician or non-physician, and compliance is mandatory.

19.     Physician employees are also subject to contractual terms within their PSA, the Medical Staff By-Laws, and Faculty Manual.

20.     UMMC protects itself from unlawful and unauthorized conduct with contracts, policies, procedures, and by-laws that prohibit such conduct. All UMMC employees must abide by those policies and procedures as a condition of employment.

21.     Batson also protects confidential information through password protected computer networks and password protected databases where electronic health information is stored, and other reasonable measures to protect confidential information. However, pursuant to the UMMC Information Security Policies, physicians and staff must have access to confidential and protected health information and other proprietary information necessary to carry out job responsibilities. That information is to be used for no other purpose.

22.     Because UMMC provides its physicians with the components of a successful clinical practice, and because Batson employees have access to confidential information including protected health information, it is especially vulnerable to unauthorized takings and trade secret misappropriation. An unscrupulous physician could take Batson's proprietary and confidential information and use them to start his or her own private practice. Such a physician could "privatize" a Batson clinic by hiring the entire clinic staff, stealing confidential patient information, and diverting the patients to the newly formed private clinic. That physician then

5

diverts revenue to himself or herself that would otherwise be used to support the children of the State of Mississippi.

23.     Stealing from Batson is stealing from the children of Mississippi.

*Bleeding Disorders*

24.     Most people take for granted the fact that blood ordinarily clots, and thus small scrapes and cuts eventually stop bleeding. However, a relatively small population of children in Mississippi have a rare genetic condition that prevents their blood from clotting properly. That condition is called hemophilia. It affects approximately 20,000 people in the United States[1] and only several hundred in Mississippi. There is presently no cure for hemophilia.

25.     Blood contains many proteins called clotting factors that help stop bleeding. People with hemophilia have low levels of either clotting factor VIII (Type A) or clotting factor IX (Type B). The severity of a patient's specific bleeding disorder is determined by the amount of clotting factor in his or her blood. The lower the amount of the clotting factor, the more likely it is that bleeding will occur. Bleeding disorders are generally classified on a scale of mild, moderate, and severe.

26.     Patients with moderate to severe bleeding disorders can bleed spontaneously and unpredictably. In addition to potentially fatal bleeds such as bleeding in the brain, these patients frequently bleed into muscles and joint spaces such as the knees, elbows, and ankles. The pressure of blood filling the joint cavity causes significant pain. In addition to acute pain, bleeding into the joint space damages the joint. Over time, repeated bleeding into joints can cause chronic hemophilic arthropathy, chronic pain, loss of range of motion in joints, crippling musculoskeletal deformity, and disability.

---

[1] https://www.cdc.gov/ncbddd/hemophilia/facts.html.

27.     The high and unpredictable risk of bleeding combined with the short and long-term consequences make these disorders more than a physical condition. These patients have decreased school attendance, constrained social interactions, disrupted family lives, and limitations in career choices. These patients are at high risk for depression, anxiety, and stress. Because patients are born with bleeding disorders, the consequences occur at an early age. Parents must be vigilant for signs their child may be bleeding internally and must care for children in pain. Parents of children with bleeding disorders must bear the weight of their ongoing responsibility of caring for the patient, recognizing when a bleed is occurring, and treating a sometimes reluctant child. These disorders affect the entire family both physically, mentally, socially, and economically.

*Treatment for Bleeding Disorders*

28.     The Centers for Disease Control and the National Hemophilia Foundation recommend that patients with bleeding disorders receive comprehensive medical care that is designed to treat the whole person and the family through continuous supervision of all the medical and psychosocial aspects of bleeding disorders. Comprehensive care is total care because every facet of the person is addressed, including physical, emotional, psychological, educational, and financial and vocational factors. The development of comprehensive care over the past 30 years has greatly improved the quality of life for people with bleeding disorders and their families, helping them become more independent and productive.

29.     Comprehensive care is organized and administered through a network of federally recognized entities called Hemophilia Treatment Centers ("HTC"). HTCs, in general, bring all

necessary components of comprehensive care into one location. HTCs also receive federal grant money. Presently there are 151 HTCs in the United States.[2]

30.     Bleeding disorders are medically treated by replacing the missing clotting factors. Patients infuse (administer through a vein) commercially prepared prescription clotting factor concentrates ("factor" or "factor drugs") to stop acute bleeding. Patients with severe, and sometimes moderate, bleeding disorders infuse factor prophylactically – before they bleed – to prevent bleeding and the acute and chronic damage bleeding causes. The frequency of these infusions varies by patient and product. For example, some factor drugs are considered long-acting and are infused less frequently, while others are considered short-acting.

31.     Factor drugs can have their own consequences. Prolonged use of factor drugs can cause patients to develop antibodies, or inhibitors, that prevent the factor drugs from working properly. Those patients must infuse anti-inhibitor drugs in addition to the factor replacement drugs to prevent or stop bleeding. Patients who are overprescribed factor drugs, including unnecessary prophylactic dosing, are placed at increased risk for developing inhibitors.

32.     Factor drugs are extremely expensive. They compose a $10 billion global market which is projected to rise to nearly $16 billion by 2025.[3] The U.S. hemophilia drug market is worth $4.6 billion per year and only serves approximately 20,000 patients.[4] Factor drugs for a single patient can easily exceed several hundred thousand dollars per year and for the most severe patients, exceeding over $1 million dollars per year is not uncommon. The cost for care for patients with inhibitors can skyrocket even higher.

[2] https://www2a.cdc.gov/ncbddd/htcweb/Dir_Report/Dir_SearchOrg.asp?inactive_flag=.

[3] https://www.marketwatch.com/press-release/hemophilia-drugs-market-size-share-analysis-industry-trends-and-growth-opportunities-forecast-upto2025-2019-06-05.

[4] https://khn.org/news/of-miracles-and-money-why-hemophilia-drugs-are-so-expensive/.

33.     Most Mississippi children with hemophilia are also Medicaid beneficiaries. In 2017 alone, Mississippi Medicaid paid $36,799,189 for 1,514 prescriptions for clotting factor drugs for an average of $24,306 per prescription. Those prescriptions were written for approximately 130 individual patients.

34.     The high cost of these drugs combined with patients' dependency on them makes bleeding disorder patients highly vulnerable to exploitation. Drug companies compete for doctors to prescribe their drug to patients, and specialty pharmacies fiercely compete for patients.[5] Even one patient with severe hemophilia can generate tremendous profit for the pharmacy that dispenses factor to that patient.

*The Professional Services Addendum*

35.     For many years, the Batson HTC was one of those 151 federally-designated HTCs. It provided comprehensive care to approximately 150 patients with bleeding disorders.

36.     In 2014, Batson recruited and hired Dr. Spencer Sullivan ("Dr. Sullivan") to be the new medical director for the Batson HTC. *See UMMC's offer letter to Dr. Sullivan, attached as Exhibit 1.*[6] Dr. Sullivan, a California native, completed his fellowship training in pediatric hematology and oncology in 2012 at Children's Hospital of Philadelphia. Batson paid Dr. Sullivan $20,000 as a recruitment incentive to come to Mississippi. *See the Physician Recruitment Agreement between UMMC and Dr. Sullivan, attached as Exhibit 2.* This was Dr. Sullivan's first job as a full-time clinician.

---

[5] https://www.nytimes.com/2016/01/14/business/hemophilia-patient-or-drug-seller-dual-role-creates-ethical-quandary.html.

[6] All exhibits to this Complaint are incorporated by reference as if fully set forth herein.

37.     Dr. Sullivan moved to Mississippi in April 2014. He immediately purchased a $240,000 parcel of land in Madison, Mississippi and began planning the construction of his $1.1 million dollar home.

38.     Dr. Sullivan started work on July 1, 2014 pursuant to the terms of his PSA. *See Dr. Sullivan's 2015-2016 PSA, attached as Exhibit 3.*[7]

39.     Pursuant to the PSA, Dr. Sullivan promised to abide by "any and all UMMC policies and procedures," to abide by "all rules and regulations now in force or as may be adopted by UMMC in the future, including without limitation any compliance plan, conflict of interest requirements, and/or any ethical code of conduct adopted by UMMC", and to work "in compliance with all applicable laws, rules, and regulations," and "exclusively for the benefit of UMMC pursuant to UMMC policies and state law."

40.     Dr. Sullivan made additional promises and commitments in his PSA, including:

> 11. Patients. All patients are at all times patients of UMMC. All case records, case histories, x-ray films and personal and regular files, in any format, concerning patients of UMMC or patients consulted, interviewed or treated and cared for by Provider hereunder shall belong to and remain the property of UMMC, and Provider shall not remove or photocopy these records at any time, including upon termination of this Addendum and employment with UMMC, except as otherwise permitted by this Section 11, or by the prior written approval of UMMC in accordance with applicable laws and UMMC policies then in effect. Upon specific request in writing from a patient or patients treated by Provider while performing professional services under this Addendum, UMMC shall release a copy of such patients' files to Provider, in the format retained by UMMC, while retaining the original, subject to applicable laws, rules and regulations. Provider agrees that he or she will not in any way use any information related to patients, patient list, demographic data and/or similar information to solicit patients for himself/herself and/or any other individual or entity, or in any way encourage such patients to leave UMMC. Provider shall not use such materials to direct announcements regarding

---

[7] The 2015-2016 PSA is identical to the 2014-2015 PSA with the exception of different effective dates.

change in his or her employment or efforts to establish a new, separate practice unless with the express written consent of the Vice Chancellor for Health Affairs. Provider further agrees that upon separation of employment from UMMC, he or shew will not, directly or indirectly, induct or solicit any patients to leave UMMC and/or patronize any competing entity, or directly or indirectly, request or advise patients to withdraw, curtail or end any relationship with UMMC.

13. Confidential Information. During or at any time after termination of Provider's employment with UMMC, Provider will not, without written authorization of UMMC, disclose to or use for the benefit of any person, corporation, or other entity, including himself or herself, any files, clients, patients, methods, operations, financing or services of UMMC, including without limitation patient files and equipment and furniture purchased by UMMC. Provider's obligations under this Addendum shall not extend to information that (a) is already known to Provider prior to the date of employment by UMMC, or (b) is already in the public domain or becomes available to the public other than through a breach of this Addendum. The parties agree that this Addendum and the terms thereof constitute a hospital record pursuant to the meaning of Mississippi Code Annotated §41-9-61(b).

41.     Pursuant to Section 14.2 of his PSA, Dr. Sullivan promised he would not "engage in the clinical practice of his or her profession" within 25 miles of UMMC for a period of one year following the termination of his employment at UMMC.

42.     Pursuant to Section 14.1 of his PSA, Dr. Sullivan promised he would not, for a period of one year following termination of his employment, solicit or hire any current UMMC employee or any person who had been a UMMC employee within the prior six months.

43.     Dr. Sullivan made those promises, and others, as a condition of employment with UMMC. Dr. Sullivan could have stayed in Pennsylvania if he was unwilling to comply with those terms. He chose to move to Mississippi and work with UMMC under those conditions. UMMC trusted Dr. Sullivan to live up to his promises.

*The Batson Hemophilia Treatment Center*

44.     As the new Medical Director of the Batson HTC, Dr. Sullivan's job was to develop the hemostasis and thrombosis program. He was paid an annual salary of $170,000 plus a full benefit package that included paid time off, life insurance, disability insurance, tuition benefits for college bound dependents, state retirement benefits. In addition, he was provided with over $117,000 to fund research in his expressed area of interest, gene therapy for hemophilia treatment. The purpose of that research was to develop a cure for hemophilia.

45.     Upon arrival, Batson entrusted a thriving medical clinic to Dr. Sullivan. The Batson HTC had a registered nurse (Defendant Stevens), a research nurse (Defendant McMillan), a social worker (Theresa Foley), a nurse practitioner (Monica Price), and an administrative assistant (Gwen Thompson). The Batson HTC staff, which had been identified, recruited, trained and retained at significant expense, had years of experience, and easily transitioned Dr. Sullivan into his new role. Batson entrusted the care of approximately 150 bleeding disorder patients to Dr. Sullivan. Not long after Dr. Sullivan arrived, Defendant Henderson replaced Theresa Foley as the Batson HTC social worker.

46.     Dr. Sullivan's clinic schedule was very relaxed because he only saw individual patients once or twice per year. Dr. Sullivan had clinic 1.5 days per week and, according to Dr. Sullivan himself, "[he was] relatively free Mondays, Wed[nesday] mornings, Thursdays, and Fridays." *See Dr. Sullivan's emails attached as Exhibit 4.*

47.     After getting settled in to his new job, Dr. Sullivan was "pleased with his job" and "happy to be here." He acknowledged he had a "good group" and "no doubt he [would] provide excellent patient care." Dr. Sullivan even attempted to recruit a colleague to Batson, telling him that UMMC was "a great place." *See Dr. Sullivan's emails attached as Exhibit 5.*

12

48.    As the Batson HTC Medical Director, Dr. Sullivan had access to confidential trade secrets such as patient information, patient payer data, reimbursement formulas, pharmacy financial compilations, employee salary data, purchasing contracts, and other confidential and valuable trade secrets.  Such access was granted only for conducting UMMC business.

49.    As the Batson HTC Medical Director, Dr. Sullivan also had access to UMMC's password protected computer system, the electronic health record (EPIC) and the use of password protected email for conducting UMMC business.

50.    In November 2014, Dr. Sullivan asked his nurse practitioner to prepare a patient list, ostensibly to evaluate the feasibility of home health services for factor infusions. *See email from Spencer Sullivan to Mike Todaro, dated November 17, 2014 attached as Exhibit 6.*[8]

51.    Dr. Sullivan received that patient list in the form of a Microsoft Excel spreadsheet titled "PatientList2014." That spreadsheet contained identified the Batson HTC patients with the following data: last name, first name, medical record number, date of birth, diagnosis, factor product used by that patient, infusion method, other medicines the patient took, health insurance carrier, and the pharmacy the patient used. Dr. Sullivan added new columns to the spreadsheet for the patients' county, city, and state of residence and instructed his administrative assistant to complete the new columns. *See email from Spencer Sullivan to Gwendolyn F. Thompson and Monica Price, dated November 27, 2014, attached as Exhibit 7.*

52.    In March 2015, Dr. Sullivan began attempting to persuade patients to use the UMMC pharmacy to fill their factor drug prescriptions. *See Dr. Sullivan's emails attached as Exhibit 8.*

---

[8] Due to their confidential nature, UMMC is not attaching the patient lists in any form to this filing.  They will be made available to the Court and the parties upon entry of an appropriate Protective Order.

53.     In April 2015, then-Director of Pharmacy Mike Todaro sent an email to Dr. Sullivan containing confidential clinic and pharmacy financial information in an excel spreadsheet called "Retail Financials thru 2015.03."[9] That document contained detailed financial data for the current fiscal year through March 2015 and several prior years of data. That data identified the revenue the pharmacy generated from dispensing factor drugs and the revenue Batson generated from Batson HTC clinical services Todaro told Dr. Sullivan "[t]his is the numbers that I referenced last week in the conference room. The [Batson] HTC is in the red [several hundred thousand dollars] so far this year. As you can see, it's been 4 years since we have lost money for the year." *See email from Mike Todaro to Spencer Sullivan, dated April 20, 2015 (attachment excluded) attached as Exhibit 9.*

54.     In September 2015, Dr. Sullivan obtained current confidential financial data relating to the Batson HTC and the Batson pharmacies. Mike Todaro sent that information to Dr. Sullivan and it showed that the Batson HTC was in the black for the current fiscal year but only slightly.[10] *See email from Mike Todaro to Spencer Sullivan, dated September 15, 2015, attached as Exhibit 10.* That information showed Dr. Sullivan that his efforts to increase utilization of Batson's pharmacy were working.

55.     Also in September 2015, Batson negotiated a better purchasing price with one drug manufacturer, which significantly increased revenue if patients using Biogen's factor drugs obtained those drugs from UMMC's pharmacy. *See email from Spencer Sullivan to Rick Barr, dated September 14, 2015, attached as Exhibit 11.*[11]

---

[9] Mike Todaro resigned from UMMC in October 2015.

[10] UMMC operates on a fiscal year that runs from July 1 through June 30.

[11] Where appropriate, confidential and proprietary information and data has been redacted from the exhibits to this Complaint.

56.     In November 2015, Dr. Sullivan obtained updated confidential financial information relating to the entire Hematology and Oncology Division, the Batson HTC, and connected pharmacy accounts. These data were current through the end of September 2015 and were delivered through confidential pdf documents and Excel spreadsheets labeled "3533-_001.pdf," "2015.09 Pharmacy Financial Reports.xlsm," and "Retail Financials thru 2015.09." These data showed a 500% increase in surplus pharmacy revenue ("contribution margin") compared with the same time period from the prior fiscal year. *See Spencer Sullivan's emails attached as Exhibit 12*. That surplus revenue totaled more than $1.5 million dollars. These same data also showed that Dr. Sullivan's clinic itself (as opposed to the pharmacy) was still in the red by tens of thousands of dollars.

57.     The same day he received these financial data, Dr. Sullivan forwarded pertinent excerpts to Dr. Gail Megason (Hematology and Oncology Division Chief), Rick Barr (former Chair of Pediatrics) and Guy Giesecke (Chief Executive Officer of Batson Children's Hospital). Dr. Sullivan sent these data in support of a prior request for a second nurse practitioner for the Batson HTC. Dr. Sullivan wanted to show his superiors how much money the pharmacy generated from dispensing the prescriptions he wrote, hoping that would convince the administration to hire a second nurse practitioner. *See email thread between Spencer Sullivan, Todd Dear, Gail Megason, Rick Barr and Guy Giesecke, dated November 12, 2015, attached as Exhibit 13*.

58.     Dr. Sullivan was having difficulty getting Batson to approve a second nurse practitioner because the clinic patient volume did not support the request. As shown in *Exhibit 13*, the Batson HTC only saw 99 total patients from July through September 2015 (41 in July, 34 in August, and 24 in September), and Dr. Sullivan already had two nurses, a nurse practitioner,

and an administrative assistant to handle that low patient volume.[12] Dr. Sullivan insisted that Batson HTC volume should not be measured by the number of patients it saw, but instead by the amount of money the pharmacy generated from dispensing the prescriptions he wrote to those patients. Dr. Sullivan attributed the increased revenue to the Batson HTC "providing good service, good care, and in general staying on top of things. Patients who were previously using other pharmacies are now using our pharmacy because they appreciate our efforts." *See Exhibit 13*.

59.     By that time, Dr. Sullivan had become aware that the small Mississippi hemophilia patient population would not support a profitable clinic. There is simply not enough volume to generate positive revenue compared with the number of staff necessary to provide hemophilia care. He had also figured out how to substantially increase pharmacy revenue in a short amount of time, and he discovered how much surplus revenue a pharmacy could generate through increased utilization by hemophilia patients.

60.     Over the next several months, Dr. Sullivan continued encouraging the Batson HTC patients to fill their factor drug prescriptions at Batson's pharmacy. While utilization of Batson's pharmacy increased, the clinic patient volume stayed the same.[13]

61.     In December 2015, the Batson administration preliminarily denied Dr. Sullivan's request for a second nurse practitioner. Staffing needs are assessed based on patient volume and the low volume did not support the request. Afterall, Dr. Sullivan only worked in the clinic 1.5 days per week. Rather than expend precious resources on a second nurse practitioner, Dr.

---

[12] That extremely low patient volume compared to the high number of staff required to provide comprehensive hemophilia care is the reason the HTC clinic operations were always in the red.

[13] Because hemophilia is both rare and genetic, patient populations grow very slowly (one or two new patients per year). A person is either born with hemophilia or they are not – hemophilia is not acquired later in life.

Sullivan could have easily held an extra half-day clinic if he believed it was necessary. But it was not necessary, and Dr. Sullivan never increased his personal clinic time in the Batson HTC.

62.    Also in December 2015, the regional coordinator for the Southeast Region Hemophilia Treatment Center Network conducted a site visit of the Batson HTC, then sent a written report of its findings to Dr. Sullivan. In the report, Karen Droze, the Regional Coordinator, said "I would like to congratulate you and your staff on the great progress that has been made since you assumed leadership." She also said "Patients interviewed today expressed a high level of satisfaction with the care and providers at this HTC." The report contained a summary of the Batson HTC, its staff, and operations. It also contained a list of observed strengths of the Batson HTC. Those reported strengths included:

> The Jackson Medical Mall location of this HTC is well maintained, accessible and provides a vast array of services available by referral.
>
> The center's team is cohesive and dedicated. They have adapted well to the change in leadership under Dr. Sullivan. Staff members present commented on how well they feel the clinic is doing and that it has evolved.
>
> Relatively new staff member Rachel Henderson is energetic and eager to learn.
>
> Nurse practitioner, Monica Price, is both knowledgeable and dedicated to her patients.
>
> Excellent working relationship and collaboration with the local NHF Chapter, the Mississippi Hemophilia Foundation.
>
> Funding from this DSH eligible 340B pharmacy has greatly contributed to the success of the program. Chapter and staff efforts are recognized, as they have resulted in the realization of program income for clinic space, salary support (e.g., nurse practitioner, social worker, two part-time nurses, and administrative assistant) and other services.

*See Site Visit Summary, attached as Exhibit 34.*

17

*Dr. Sullivan steals the Batson HTC*

63.     On January 2, 2016, Dr. Sullivan took an interest in an article he found in the internet called "How to become a millionaire – 9 habits that can make you rich," and he forwarded the article link from his UMMC email account to his personal email account. The introduction to that article reads: "Want to get rich? If you work for someone else, you won't." *See Dr. Sullivan's email to himself dated January 2, 2016, attached as Exhibit 14.*

64.     Three weeks later, Dr. Sullivan requested and obtained confidential financial data relating to the Batson HTC and all three hemophilia pharmacy accounts, current through the month of December 2015. Those data were provided to Dr. Sullivan in an Excel spreadsheet titled "Hemophilia Financials through December.xlsx." The data showed a 5,000% increase in pharmacy contribution margin compared the same period in the prior fiscal year (an increase of several million dollars). The data also showed a 371% decrease in clinic revenue under the same comparison. However, the clinic deficit was small (less than $100,000) compared to the increased pharmacy revenue. *See email thread between Spencer Sullivan and Stacey Baughn, dated January 20, 2016, attached as Exhibit 15.* Considered as a single entity, the clinic and the hemophilia aspect of the pharmacy were highly profitable.

65.     The very next day after obtaining the updated confidential financial data, Dr. Sullivan sent the following email to his attorney Susan Pinkston ("Pinkston"), asking a simple question:

> Susan,
>
> How are you? Did you tell me you work with physicians who are thinking of opening a private practice?
>
> Spencer Sullivan

*See email from Spencer Sullivan to Susan Pinkston, dated January 21, 2016, attached as Exhibit 16*. After only 18 months at Batson and less than 2 years as a resident of Mississippi, Dr. Sullivan had thus embarked upon a plan to steal the Batson HTC, and the pharmacy revenue it generated for the Blair E. Batson Hospital for Children.

66.     Later that week, Dr. Sullivan sent Pinkston copies of his offer letter and PSA with the statement "there is non-compete language in both." *See email from Spencer Sullivan to Susan Pinkston, dated January 25, 2016, attached as Exhibit 17* (attachments omitted as duplicative).

67.     Dr. Sullivan's emails reveal he found motivation from Rush Limbaugh in an episode dedicated to explaining how then-presidential candidate Donald Trump "refused to play by the rules." *See email from Dr. Sullivan to himself, dated January 27, 2016, attached as Exhibit 18*. Dr. Sullivan had already decided he was not going to honor his promises or commitments. For Dr. Sullivan, the rules did not apply.

68.     By the end of the week, Dr. Sullivan was seeking a business loan and an accountant. *See email thread between Spencer Sullivan to Todd Mangum, dated January 31, 2016, attached as Exhibit 19*.

69.     Dr. Sullivan devoted the next five months, largely on UMMC time, to accomplishing his new personal mission. He used his UMMC email account to carry it out. Dr. Sullivan expressly waived any right of privacy in his use of UMMC email through the UMMC Information Security Policies and other applicable UMMC policies and procedures.

*February 2016*

70.     During the month of February 2016, Dr. Sullivan hired an accountant, began searching for a hematology billing company, and verbally committed to office space (instructing the lessor to "keep this confidential as I work at UMC and just about everybody knows everybody"). He began researching Mississippi laws regarding having a specialty pharmacy as

19

part of a medical practice, and researching laboratory equipment (assisted by his wife Lisa Sullivan who at the time was a UMMC-employed pathologist). He also sought laboratory pricing information from UMMC employees who had no idea what Dr. Sullivan was up to. *See Exhibit 20, a collective exhibit of Spencer Sullivan's emails from February 2016.*[14]

71.     Dr. Sullivan also obtained an updated list of Batson HTC patients with detailed health information about each patient. That list was sent to Dr. Sullivan via email from nurse practitioner Monica Price on February 3, 2016 and within an Excel spreadsheet titled "BleedingDisorderPatientList2016.xlsx." *See Exhibit 20.*

72.     Dr. Sullivan told no one at UMMC anything of his plans. To the contrary, he affirmatively created the impression that he would remain at UMMC for the indefinite future. In February 2016, Dr. Sullivan requested artwork for the Batson HTC. He also asked his Division Chief Dr. Gail Megason to approve his attendance at two out of state hemophilia conferences, to be paid for by Batson. He also participated in a "Hemoc-Bleeding Disorder Planning" meeting to continue discussions of his earlier request to move the HTC to the main campus. *See Exhibit 20.* These and other overt acts were done specifically to conceal his plan to privatize the Batson HTC.

*March 2016*

73.     On March 15, 2016, Dr. Sullivan emailed Pinkston and declared "I'm ready to establish the business entity. Can we meet this week?" He advised Pinkston that he did not plan on having any partners, but he would have employees and possibly physician employees. He inquired into making his wife Lisa Sullivan an officer of his new entity and asked if that would be a "major conflict" for her employment at UMMC (she was still employed as a pathologist at

---

[14] These emails and all other collective email exhibits are organized chronologically.

UMMC at that time). *See Exhibit 21, a collective exhibit of Spencer Sullivan's emails from March 2016.*

74.     Dr. Sullivan continued his affirmative acts of concealment through March 2016. On March 23, 2016, Dr. Sullivan encouraged and approved a request for Batson to spend $8,000 on new paint for the Batson HTC and $500 for a new sign. *See Exhibit 21.*

75.     The same day, Dr. Sullivan arranged a meeting with then-current Batson pharmacist Josephine "Emmy" Steevens to discuss "business over coffee." *See Exhibit 21.*

76.     Steevens was a Batson pharmacist who oversaw the anticoagulation laboratory at UMMC. She was actively involved in managing medical care of patients with clotting disorders (essentially the opposite of hemophilia, in which the blood clots too much). Because those conditions were also treated within the Batson HTC, she worked closely with Spencer Sullivan. She was the first person Dr. Sullivan recruited to assist the formation of his new entity. The fact that his first employee recruitment was a pharmacist, rather than a nurse or nurse practitioner, shows that Dr. Sullivan's concern was, first and foremost, for the pharmacy revenue - *not* for patient care. Dr. Sullivan and Steevens met to discuss their "business over coffee" on March 29, 2016. *See Exhibit 21.*

77.     On March 29, 2016, Dr. Sullivan's new entity, called "Mississippi Center for Advanced Medicine" ("MCAM") was officially created. *See MCAM Articles of Incorporation, attached as Exhibit 23.*

78.     MCAM is a Mississippi for-profit corporation. MCAM's 2018 Annual Report shows that Dr. Sullivan is the President, Secretary, Treasurer, and sole officer of MCAM. *See 2018 Annual Report, attached as Exhibit 24.*

79.     MCAM is solely owned by Dr. Sullivan – he has no partners and there are no other shareholders.

80.     Dr. Sullivan submitted a resignation letter on March 30, 2016, notifying UMMC that his last day would be June 30, 2016. His PSA required 90 days' notice of termination. He made no mention of his plans, and offered no reason whatsoever for his resignation. *See Spencer Sullivan's resignation letter, dated March 30, 2016, attached as Exhibit 22.*

81.     On March 31, 2016, Dr. Sullivan sent an email to Rick Barr (then-Chair of Pediatrics) notifying Dr. Barr that Dr. Sullivan was resigning effective June 30, 2016. Dr. Sullivan gave no explanation or reason for his resignation in that email. *See Exhibit 21.*

82.     On March 31, 2016, Dr. Sullivan submitted his formal resignation into UMMC's computer system. When asked to identify the reason for his resignation, Dr. Sullivan identified the reason as "personal." *See Exhibit 21.*

83.     That same day, March 31, 2016, Dr. Sullivan emailed to himself through his password protected UMMC email account three Excel spreadsheets containing the confidential financial data he received via email from the Pharmacy department over the prior several months. Those Excel spreadsheets are titled "Hemophilia Financials through December.xlsx," "Retail Financial.xlsx," and "Retail Pharmacies.xlsx." Those spreadsheets contained extensive confidential financial information about the pharmacy operations and Batson HTC clinic operations, including financial data for the current and prior years and detailed graphs showing financial trends. Those spreadsheets separated financial information by payer source, costs of goods, contribution margins, costs of salaries and employee fringe benefits, and other confidential and proprietary information that Dr. Sullivan did not have permission to take from Batson (or even access) for his own personal use. *See Exhibit 21.*

22

84.     The same day, March 31, 2016, Dr. Sullivan emailed the proposed "MCAM Budget" in an Excel spreadsheet to his accountant Cheryl Lee at Haddox Reid Eubank Betts, PLLC through is password protected UMMC email account. In his email with the subject "proforma," he informed Lee that "the pharmacy numbers are a good estimate of what to expect in terms of revenue and expenses." *See Exhibit 21*. In short, Dr. Sullivan converted the Batson confidential pharmacy and clinic data into MCAM's budget.[15] In the budget, Dr. Sullivan projected his monthly overhead would be $46,333 with $0 in monthly clinic profit and $496,625 in monthly pharmacy profit. By way of comparison, Dr. Sullivan was making $14,166 per month at Batson. Dr. Sullivan projected that stealing from Batson would allow him to increase his income by thirty-five times.

85.     From that point forward, Dr. Sullivan was at all times employed by MCAM and acting solely in the best interest of MCAM, even though he remained employed at Batson for another 3 months (his last day at Batson was June 30, 2016). From that point forward, Batson had a secret saboteur working inside the institution with full access to confidential information, trade secrets, staff, and patients.

*April 2016*

86.     On April 4, 2016, Dr. Sullivan accessed another updated list of all HTC patients through his password protected UMMC email account which included extensive personal data for each patient as identified earlier. This was an updated version of the patient list Dr. Sullivan accessed on several prior occasions. *See Exhibit 25, a collective exhibit of Spencer Sullivan's emails from April 2016.*

---

[15] Sullivan even used the same terminology in several fields such as "commodities" and "contractual services."

87.     On April 5, 2016, Dr. Sullivan emailed Scott Everson with the firm "Practice Max," a "list of payers" for his bleeding disorders patients. Dr. Sullivan sent that list through his password protected UMMC email account. Dr. Sullivan sent this list to Everson so Practice Max could begin the payer credentialing process. *See Exhibit 25*. Practice Max is Dr. Sullivan and MCAM's practice management company.

88.     Dr. Sullivan had a telephone conference with Practice Max's Scott Everson the same day, April 5, 2016. After the telephone call, Scott Everson sent Dr. Sullivan an email containing notes from the call. Scott Everson's notes include: "[a]nticipates wanting to eventually grow the practice into a multi-specialty pediatric practice," and "here is a list of payers (pulled from his patient database)." *See Exhibit 25*.

89.     On April 6, 2016, Dr. Sullivan began scheduling demonstrations for an electronic health record system to use at MCAM. *See Exhibit 25*.

90.     On April 6, 2016, Emmy Steevens sent an email to Dr. Sullivan with an update on her progress. In it, Steevens says "I looked at the Indiana's website (IHTC), did you know they are a 501(c)(3)?" In response, Dr. Sullivan said "I did not know IHTC was a non-profit" and "[t]he majority of our hemophilia patients are MS Medicaid and I have a solid relationship with them, so there should not be an issue providing for Medicaid patients." *See Exhibit 25*.

91.     On April 7, 2016, Emmy Steevens emailed Dr. Sullivan asking "[a]re you going to be able to talk to patient/parents about your departure at family retreat or will you have to keep that quiet?" The next day Dr. Sullivan responded "I was thinking about starting to mention to patients that I will be leaving starting Tues[day]. The family retreat is a good idea as well." *See Exhibit 25*.

92.     On April 11, 2016, Dr. Sullivan began the process of obtaining malpractice insurance for MCAM. *See Exhibit 25.*

93.     Also on April 11, 2016, after learning of Dr. Sullivan's resignation, UMMC employee and Mississippi Hemophilia Foundation member Patty Lyons asked Dr. Sullivan if there was anything she could do to change his mind. In response, Dr. Sullivan confirmed his anticipated departure without elaboration and advised Lyons "I think that's best for *me* right now." *See Exhibit 25 (emphasis added).* Dr. Sullivan made no mention of what would be best for Batson's patients.

94.     Also on April 11, 2016, Emmy Steevens delivered a progress report to Dr. Sullivan. After conducting research on Dr. Sullivan's behalf, Steevens advised Dr. Sullivan:

> "It makes me think you need to establish the organization as a non-profit? Now when going through the Hemophilia Alliance website, is TAP (the alliance pharmacy) what you would use as the wholesale distributor by joining TAP? They are a non-profit too that also operates as a pharmacy. I'm beginning to think all of these pharmacies and HTC are non profit organizations which may be needed to make it work?"

*See Exhibit 25.* Emmy Steevens' assessment was accurate. At that time, every HTC in the country was organized as a non-profit charitable institution, including Batson.

95.     In response to Steevens' April 11, 2016 email, Dr. Sullivan said:

> Thank you for the references. As a for profit organization, we may not be able to be a covered entity under the 340b program, even with a Hemophilia Treatment Center designation. *That's ok though, as the majority of our hemophilia business is with Medicaid, which is carved out of the 340b program.* Also, there are other mechanisms to get competitive pricing on drugs, including directly from the manufacturer. Lastly, I see MCAM expanding beyond hemophilia (possibilities include lab services, home health, coagulation clinic, physical therapy, child psychology, other pediatric subspecialties, etc.).

*See Exhibit 25*. Dr. Sullivan's future business model was devoted to anticipated profits from Medicaid reimbursement. His plan was to divert Medicaid payments (state funds) from Batson (a state institution) to himself.

96.     Also on April 11, 2016, Dr. Sullivan informed Susan Pinkston that he had discussed the MCAM ownership arrangement with his wife Lisa Sullivan and "we feel its best to leave her off the business since she will continue to work at UMC, which will create a potential conflict of interest and must be reported to UMC." *See Exhibit 25*. Dr. Sullivan was still affirmatively concealing his MCAM plan from UMMC.

97.     By April 14, 2016, Dr. Sullivan informed Emmy Steevens he was working on telephone numbers, fax numbers, a web address and establishing a business bank account for MCAM. He also informed Emmy Steevens that he had also spoken with "Joe [Pugliese] at Hemophilia Alliance yesterday and things are moving on that front." *See Exhibit 25*. The reference to Hemophilia Alliance pertained to Dr. Sullivan obtaining competitive pricing for factor drugs.

98.     On April 19, 2016, Dr. Sullivan emailed Patrick Lukacs at Practice Max  and informed him that "Emmy Stevens [sic], clinical pharmacist for the Mississippi Center for Advanced Medicine, has some questions." *See Exhibit 25*.

99.     As of April 19, 2016, Emmy Steevens was both a Batson employee and MCAM's "pharmacist-in-charge."

100.     According to Mississippi Pharmacy Practice Regulations implemented by the Mississippi Board of Pharmacy, a "pharmacist-in-charge" is defined as "a Pharmacist currently licensed in this state who accepts responsibility for the operation of a Pharmacy in conformance with all laws and rules pertinent to the Practice of Pharmacy and the Distribution of Drugs and

Devices, and who is personally in full and actual charge of such Pharmacy and personnel."[16] The pharmacist-in-charge "shall be responsible for complete supervision, management, and compliance with all federal and state pharmacy laws and regulations pertaining to the practice of pharmacy in the entire prescription department."[17] Pursuant to Mississippi law, a pharmacist-in-charge "shall be responsible for written policies and procedures for maintaining the integrity and confidentiality of prescription and patient health care information."[18]

101.    On April 20, 2016, Emmy Steevens completed the MCAM pharmacy permit and forwarded it to Dr. Sullivan. Emmy Steevens signed the permit in her name. *See Exhibit 25.*

102.    According to Mississippi Pharmacy Regulations, "[t]he person who signs the application for a pharmacy permit or the renewal of a pharmacy permit shall be the pharmacist-in-charge (PIC) for that facility."[19]

103.    In the MCAM pharmacy permit, in the section asking for a brief description of pharmacy services, Emmy Steevens wrote "[d]ispensing of pharmacy products, primarily related to hemostasis and thrombosis." *See Exhibit 25.*

104.    On April 21, 2016, Valerie Peterson with Practice Max emailed to Dr. Sullivan a calendar invitation for an electronic health record system demonstration schedule to take place on April 22, 2016. Dr. Sullivan responded "I accept, but don't want to add to my calendar." *See Exhibit 25.* Dr. Sullivan did not want anyone who had access to his calendar to see the appointment because he was still affirmatively concealing his plans from UMMC.

---

[16] Mississippi Pharmacy Practice Regulations, Definition 55 "Pharmacist-in-Charge."

[17] Mississippi Pharmacy Practice Regulations Article VII §1A.

[18] Mississippi Pharmacy Practice Regulations Article VII §8.

[19] Mississippi Pharmacy Practice Regulations Article VII §1.

105.    The same day, April 21, 2016, MCAM held its first shareholders meeting and adopted by-laws. *See Exhibit 25 (MCAM By-Laws and minutes from first shareholder meeting included).*

106.    On April 22, 2016, Dr. Sullivan began informing select people of his plans to open a private practice. In an email to Patty Lyons, Dr. Sullivan said "Just to let you know, I have decided to go into private practice in Madison, MS. I did not mention when I saw you last because I didn't have everything finalized until yesterday." *See Exhibit 25*.

107.    Also on April 22, 2016, Dr. Sullivan also emailed John Gentry, Randy Smith, and Scot Mascioli with Biogen (factor drug manufacturer), James Tissier with Baxalta (factor drug manufacturer), and Andrew Berkowitz with Pfizer (factor drug manufacturer) to inform them he was leaving Batson, that his last day would be June 30, 2016, and that his new practice would include "a small pharmacy." Dr. Sullivan asked those drug manufacturer representatives to "[p]lease keep this between us," and asked to arrange a conversation within the next two weeks. *See Exhibit 25*.

108.    On April 26, 2016, Dr. Sullivan – who, it will be remembered, had still not disclosed to UMMC that he was actively working to privatize the Batson HTC - emailed the Batson pharmacy department asking for "current 340b and non 340b pricing for factor products." *See Exhibit 25*.

109.    On April 26, 2016, Dr. Sullivan emailed Melissa Limbaugh with Norvo Nordisk (factor drug manufacturer), and Jennifer Litten with CSL Behring (factor drug manufacturer) to inform them he was leaving Batson, that his last day would be June 30, 2016, and that his new practice would include "a small pharmacy." Dr. Sullivan asked those drug manufacturer

representatives to "[p]lease keep this between us," and asked to arrange a conversation within the next two weeks. *See Exhibit 25*.

110.    By April 27, 2016, Dr. Sullivan had completed the design for MCAM's logo. *See Exhibit 25*.

111.    On April 29, 2016, one month after resigning and after getting everything "finalized" for MCAM, Dr. Sullivan sent an email to Dr. Rick Barr and Dr. Gail Megason with the subject "update." Dr. Sullivan said in that email:

> Hi guys,
>
> I've been considering industry positions versus private practice, but the most interesting industry position would require us to move to Boston, MA. Lisa and I are not ready to make that move, so I have decided to go into private practice. This is not unprecedented for HTC physicians (Indiana HTC, Illinois, Orange County, etc.) who are having difficulty getting institutional support. Depending on your interest level, we can potentially continue to work together, both clinically and from a research (gene therapy) standpoint).

*See Exhibit 25*.

112.    Dr. Sullivan's categorization of his decision to go into private practice as an "update" can only be described as fraudulent. The pretended disclosures made in this email are starkly contrasted with Dr. Sullivan's progress with MCAM before April 29, 2016, as demonstrated by the preceding paragraphs and the incorporated exhibits.

113.    The omissions from Dr. Sullivan's email are too many to list. By way of example, Dr. Sullivan does not disclose that his new practice will be within 25 miles of UMMC or that he is currently soliciting UMMC employees and patients to join him. He omits his intention expand into a multi-specialty pediatric practice and to open a pharmacy to dispense the prescriptions he writes to Batson HTC patients, which is a significant source of revenue to Batson. He omits that

a current Batson employee is currently serving as his pharmacist-in-charge, and he omits his plan

to hire nearly all of the Batson HTC clinic staff to join his new practice. Those are just a few of

the affirmative acts of concealment undertaken by Dr. Sullivan to conceal his plans and

intentions.

114.    Other statements made in Dr. Sullivan's email are simply false. Dr. Sullivan was

not considering any "industry positions." There was no consideration of moving to Boston, much

less a decision against it. Dr. Sullivan dedicated the entire three months preceding this email to

forming MCAM.

115.    There is no evidence to suggest that the Indiana HTC, any of the six HTC's in

Illinois, or the Center for Inherited Blood Disorders in Orange, California ("Orange County")

were established by physicians "having difficulty getting institutional support." Further, the

Indiana HTC and Orange County HTC are both 501(c)(3) non-profit charitable institutions, and

all six HTC's in Illinois are either public institutions (such as Batson) or 501(c)(3) charities.

MCAM, by contrast, is a for-profit corporation with only one shareholder – Spencer Sullivan.

116.    Dr. Sullivan was not "having difficulty getting institutional support." Dr. Sullivan

was denied a second nurse practitioner because his clinic – which was already staffed with a

registered nurse, a research nurse, a nurse practitioner, a social worker, and an administrative

assistant, only saw roughly 30 patients per month, at the most. The Batson HTC had a highly

experienced and well-liked nurse practitioner who covered most of the clinic responsibilities in

the Batson HTC. Dr. Sullivan had total clinic responsibilities 1.5 days per week (one morning

clinic at the Batson HTC and two half-day non-Batson HTC clinics). A second nurse practitioner

would only further diminish Dr. Sullivan's clinical responsibilities but not improve anything

30

because patient volume was not a problem. Dr. Sullivan's email to Dr. Barr and Dr. Megason evidence that point. In it, he says he is interested in continuing to "work together" "clinically."

117.    Dr. Sullivan was not interested in the unprofitable Batson HTC clinical practice, he only wanted the pharmacy revenue. Dr. Sullivan only wanted the patients so he could get rich from selling them their medicine (medicine that he prescribed to them).

*May 2016*

118.    On May 3, 2016, Dr. Sullivan emailed his attorney Susan Pinkston and asked "should I trademark Mississippi Center for Advanced Medicine?" The reason for his request was "[d]on't want UMC (or anyone else) getting any bright ideas." *See Exhibit 26, a collective exhibit of Spencer Sullivan's emails from May 2016.*

119.    On May 5, 2016, Dr. Sullivan sent an email to Defendants Rachel Henderson, Linnea McMillan and Kathryn Sue Stevens providing them with the MCAM address. Dr. Sullivan said "Linnea, Sue and Rachel and I are going to head our [sic] around 4 today to go look at the space. Please join us if you'd like." *See Exhibit 26*. McMillan did join Henderson, Stevens and Spencer Sullivan on that MCAM tour.

120.    The next day, Sue Stevens sent an email to Mari LeBlanc in the payroll department at UMMC and said:

> Hey Marie,
>
> I hate to trouble you, but I had to go to a meeting yesterday afternoon with Dr. Sullivan and I didn't get back in time to punch out. Could you put my time in? It was 5:30. Let me know if you need me to do anything else.
>
> Thank you so much!
> Sue Stevens

*See Exhibit 26*. Defendant Stevens omitted that her "meeting with Dr. Sullivan" was a tour of his new private clinic in order to induce the State of Mississippi to pay her for the time she spent advancing the interests of MCAM.

121.    On May 9, 2016, a representative from Synergy Medical asked Dr. Sullivan to submit a bio in anticipation for an upcoming symposium on a clinical trial he was involved in on behalf of Batson. Dr. Sullivan sent the following bio:



**Spencer K Sullivan**
**Mississippi Center for Advancecd Medicine, USA**

Spencer K Sullivan is  the Founder, President and Chief Executive Officer of the Mississippi Center for Advanced Medicine, which was established in March 2016.

Following the completion of his medical degree in 2005, which he received from the Unvierisity of North Carolina at Chapel Hill, USA, Dr Sullivan carried out his residency in pediatrics at the University of Virginia. He then went on to complete two fellowship appointments, one in transfusion medicine, at the University of Virginia, and another in pediatric hematology, at the Children's Hospital of Philadelphia.

Dr Sullivan's clinical interests include pediatric hemostasis, thrombosis and coagulation, and he is a member of ASH, ISTH and HTRS.

*See Exhibit 26*.

122.    Dr. Sullivan did not make a single reference to Batson or the University of Mississippi Medical Center even though he was still employed at UMMC. In fact, Dr. Sullivan's

last day of employment at Batson was still six weeks away. Instead, Dr. Sullivan represented himself to be the "Founder, President and Chief Executive Officer of the Mississippi Center for Advanced Medicine, which was established in March 2016." Dr. Sullivan concealed his current employment at UMMC and the fact that MCAM was still six weeks away from seeing its first patient. Dr. Sullivan's bio establishes that he was acting solely in the best interest of MCAM while employed at UMMC.

123.     Dr. Sullivan's bio also represents his first fellowship training to be solely in "transfusion medicine" when in fact that fellowship was in "blood banking and transfusion medicine" (which is administered by the American Board of Pathology). Dr. Sullivan had no involvement with the UMMC blood bank nor was he involved in a single blood transfusion at UMMC. *See Spencer Sullivan's Curriculum Vitae dated 6/2/2016, attached as Exhibit 27.*

124.     Dr. Sullivan also represented his second fellowship to be in "hematology" when in fact that fellowship was in "hematology/oncology," which is the same fellowship training obtained by all hematologist/oncologist physicians at UMMC. Dr. Sullivan's Curriculum Vitae does not reveal the attendance or completion of a hemostasis and thrombosis fellowship or any additional fellowship training after completing his fellowship in hematology/oncology.

125.     On May 10, 2016, Dr. Sullivan emailed his accountant Cheryl Lee to advise he "had three employees thus far" identified as Defendants McMillan, Henderson, and Stevens. The only current Batson HTC employee not hired was administrative assistant Gwen Thompson. The email also included the salaries of those employees which were all higher than their salaries at UMMC. In fact, Spencer Sullivan nearly doubled Defendant McMillan's salary. *See Exhibit 26.* While Dr. Sullivan advised he would not be paying any retirement benefits, other emails show he

promised his employees "bonuses" which were later determined to be based on pharmacy revenue from dispensing clotting factor drugs.

126.     On May 18, 2016, one week after joining MCAM, Defendant McMillan submitted her resignation to UMMC with an effective date of June 30, 2016. The reason given for her resignation was "job closer to home with more hours." *See resignation confirmation emails, attached as Exhibit 35.*

127.     After Emmy Steevens decided to not join MCAM, Dr. Sullivan hired UMMC pharmacy fellow Kayla Peeler Douglas as MCAM's pharmacist-in-charge on May 23, 2016. *See Exhibit 26.* Spencer Sullivan, Linnea McMillan, Sue Stevens, Rachel Henderson, and Kayla Douglas were the original members of MCAM.

*June 2016*

128.     Dr. Sullivan and McMillan, Stevens, and Henderson spent most of June making final preparations for MCAM while still employed at UMMC and accepting the wages and benefits of employment with UMMC. The group, individually and collectively misappropriated all trade secret information they believed they would need to facilitate dispensing clotting factor drugs at MCAM.

129.     Dr. Sullivan relieved administrative assistant Gwen Thompson of her patient scheduling responsibilities and reassigned those to Defendant Stevens. Stevens began keeping a paper appointment book for MCAM and scheduling Batson patients for follow up visits at MCAM. Emails from Dr. Sullivan to Sue Stevens dated June 15, 2016 reveal Dr. Sullivan directed Stevens to schedule patients for follow up at MCAM. *See Exhibit 28, a collective exhibit of Spencer Sullivan's emails from June 2016.*

130.    On June 6, 2016, Defendant Rachel Henderson submitted her resignation to
UMMC, one month after becoming MCAM's employee and/or agent. The effective date of her
termination was July 6, 2016, and the reason she gave for her termination was "better job
opportunity with increase pay and benefits and location is closer to my home." *See Exhibit 35*.

131.    Also on June 15, 2016, Dr. Sullivan sent Defendant Stevens a confidential patient
list in an Excel format titled "ClottingDisorderPatientList2015." That email was sent using Dr.
Sullivan's password protected UMMC email account and received on Defendant Steven's
password protected UMMC email account. Dr. Sullivan directed Stevens to "[p]lease reconcile
with what you have on your anticoagulation follow-up list and send letters to those patients
please." *See Exhibit 28*. The "anticoagulation follow-up list" was a list of patients who received
anticoagulation monitoring in connection with the Batson HTC. Dr. Sullivan and Defendant
Stevens misappropriated those confidential patient lists and used them for the purpose of
scheduling patients at MCAM without UMMC's knowledge or consent.

132.    On June 16, 2016, Dr. Sullivan misappropriated his progress note and "history
and physical" medical record template used within UMMC's electronic medical record (EPIC),
and sent those to Emily Daugherty at Practice Max for her to incorporate into other records
created for Dr. Sullivan's use at MCAM. *See Exhibit 28*.

133.    On June 17, 2016, Defendant Stevens submitted her resignation to UMMC, more
than one month after becoming an employee / agent of MCAM. The effective date of her
resignation was July 1, 2016 and the reason she gave for her resignation was as follows:

> Please accept this notification that I am resigning from my position
> as RN. My last day will be 7-1-16. Thank you so much for the
> opportunity to work in this position for the past 8 ½ years. I've
> greatly enjoyed and appreciated the opportunities I've had to learn
> and train others about bleeding disorders, all of which I will take
> with me throughout my career. Please let me know if there's

anything I can do to aid during the transition. I hope to stay in
touch with UMMC.

Sincerely, Sue Stevens.

*See Exhibit 35*. Sue Stevens took far more than her training and experience with her to MCAM.

She also took confidential patient lists and patient data for use at MCAM.

134.    On June 18, 2016, Dr. Sullivan sent an email to Robert Garland at Cardinal

Health (a distributor of factor drugs), Tommy Ball at Morris Dickson (a distributor of factor

drugs), and Darrell Johnston at Amerisource Bergen (a distributor of factor drugs). In those

emails, Dr. Sullivan said "[MCAM] will provide factor products to a large number of hemophilia

patients in Mississippi as I am the only hemophilia physician in the state." *See Exhibit 28*. Dr.

Sullivan's statement that he is the "only hemophilia physician in the state" is patently false.

135.    On June 20, 2016, Dr. Sullivan instructed MCAM's pharmacist-in-charge, via his

UMMC email, to "bring a copy of the flowsheet that's used in the anticoagulation clinic" so "we

can compare that to what we use in the bleeding disorders clinic and then send a copy of the one

we want to use to [Practice Max]." Kayla Douglas responded "I certainly can. I'll come prepared

with copies of each template we use." Dr. Sullivan then thanked Douglas for her cooperation.

*See Exhibit 28*.

136.    On June 25, 2016, Dr. Sullivan sent MCAM's business plan to Larry Lawrence

with Cardinal Health (factor drug distributor). *See MCAM Business Plan attached as Exhibit 31*.

In the Business Plan, Dr. Sullivan said "our main competitor is the University of Mississippi

Medical Center (UMC), who has the equivalent of 6 full time pediatric

hematologists/oncologists." Dr. Sullivan viewed UMMC as his competition yet he was still

employed at UMMC and accepting salaries and all other benefits of that employment at the same

time. MCAM had been operating for three months inside the walls of UMMC.

137.    Also in the Business Plan, Dr. Sullivan calculated a financial projection which estimated annual sales of $18.3 million, $19.3 million, and $20.3 million in the first three years. He also projected gross profits of $6 million, $6.3 million, and $6.6 million in those years. Finally, after accounting for a $1 million dollar per year annual salary for himself, Dr. Sullivan estimated yearly net revenue to MCAM of $4.1 million, $4.4 million, and $4.6 million. Nearly all of that money would come from Mississippi Medicaid and every dime of it should have gone to Batson Children's Hospital. *See Exhibit 28.*

*Theft of the Patient List*

138.    Neither Dr. Sullivan nor his staff would have access to the Batson HTC patients' electronic health records once they left UMMC. Given that all MCAM revenue was tied to dispensing factor drugs that Dr. Sullivan prescribed, he decided to steal the patients' medical information and bring it with him. Since he couldn't practically print and steal entire medical charts for 150+ patients, he decided to create and steal a detailed list of patients with all of the information he needed to write prescriptions and create surgical plans.

139.    Dr. Sullivan's practice at Batson HTC was that he would only write prescriptions for factor drugs in a 30 day supply. He would not write a new prescription for anyone unless they called the Batson HTC and spoke with either McMillan, Stevens, Henderson, or Monica Price. Dr. Sullivan took the list so he could immediately begin dispensing factor drugs without waiting for the patient to visit the clinic. As stated earlier, Dr. Sullivan only scheduled patients to visit the clinic once or twice per year.

140.    On June 15, 2016, Dr. Sullivan sent a patient list to Defendant Sue Stevens and Defendant Linnea McMillan via UMMC email. Dr. Sullivan attached the patient list to that email in an Excel format and titled it "BleedingDisorderPatientList2016.xlsx" with instructions to the

staff to "update/complete the highlighted fields in yellow" and "add weight in kilograms." Factor drug dosing is based on the patient's weight in kilograms, so that information is necessary for prescribing and dispensing the drugs. The Excel spreadsheet attached to that email had three new columns added, all highlighted in yellow, where the staff was instructed to input each patient's weight in kilograms and date of their last appointment. *See collection of emails related to theft of this patient list, attached as Exhibit 29.*

141.    The following day, June 16, 2016, Dr. Sullivan resent that patient list to Defendants Stevens, McMillan, Henderson, and to himself. Dr. Sullivan had added two additional columns, both highlighted in yellow, for the staff to complete. In the email, Dr. Sullivan said "we should probably add phone numbers as well." The two new columns were for the patient's mobile number and home phone number. *See Exhibit 29.* After completion, this list will contain the following information about each Batson HTC patient (as represented by the column headings on the list): last name, first name, medical record number, date of birth, age, diagnosis, factor product used, dose and frequency of infusion, infusion method, other medicines used by the patient, insurance, pharmacy used, county, city, and state of residence, home phone number, mobile phone number, weight in kilograms, and date of last appointment.

142.    Over the next two weeks, Defendant Henderson improperly accessed UMMC's password protected electronic health record system to obtain the detailed patient information Dr. Sullivan requested for that patient list. Defendant Henderson exceeded her authority to access that information, and she was prohibited from accessing that database for her own personal use or for the personal use of Dr. Sullivan, MCAM, or anyone else.

143.    On July 1, 2016, Defendant Henderson sent the finalized completed patient list to Defendant Stevens at 11:30 a.m. The patient list was sent in Excel format and titled "Copy of

BleedingDisorderPatientList2016 – Pt info chart.xlsx." Metadata obtained from that list (which is included within Exhibit 29) reveals that document was last saved by Rachel L. Henderson on "6/29/2016 at 2:29 PM" and last printed on "6/29/2016 at 2:24 p.m.". This patient list has an embedded footer that automatically populates the date the document is printed in the bottom center of each page of the document. *See Exhibit 29*. So if this patient list was printed on June 29, 2016, the footer on that printed document will read "updated 6/29/2016."

144.    Approximately four hours after receiving the updated comprehensive completed patient list from Defendant Henderson, Defendant Stevens sent two patient lists to Director of Pharmacy Todd Dear. Dear previously requested a comprehensive patient list so UMMC could ensure every patient was accounted for given that the entire Batson HTC medical staff was moving to MCAM.

145.    Defendant Stevens divided Defendant Henderson's list into two separate lists, one for patients aged 18 and below and one for patients over 18 (a "peds" list and an "adult" list). However, Defendant Stevens did not send Todd Dear the same information received from Defendant Henderson. Instead, Defendant Stevens sent Todd Dear a far less comprehensive list. The lists Defendant Stevens sent to Todd Dear contained the following information only: last name, first name, medical record number, date of birth, age, diagnosis, factor product, insurance, pharmacy, and date of last appointment. The lists Defendant Stevens sent to Todd Dear omitted: dose and frequency of infusion, infusion method, other medicines used by the patient, county, city, and state of residence, home phone number, mobile phone number, weight in kilograms.

146.    Defendant Henderson prepared the list she sent to Defendant Stevens on July 1, 2016.

147.    Defendant Henderson previously printed that list on June 29, 2016.

148.   Defendant Henderson prepared that list at Dr. Sullivan's request.

149.   Dr. Sullivan asked Defendant Henderson to prepare that list for use at MCAM.

150.   The patient list that Defendant Henderson sent to Defendant Stevens on July 1, 2016 was taken to MCAM.

151.   The patient list that Defendant Henderson sent to Defendant Stevens on July 1, 2016 was used at MCAM.

152.   Defendants prepared, took from UMMC, and used at MCAM other versions of this patient list.

153.   Defendants prepared, took from UMMC, and used at MCAM other confidential trade secret information as will be shown by the evidence.

154.   Metadata from the lists Defendant Stevens sent to Todd Dear reveal that the adult list was last saved by Defendant Stevens on 7/1/2016 at 3:07 p.m. and last printed at 2:53 p.m. the same day. Metadata from the "Peds" list reveals it was last saved by Defendant Stevens on 7/1/2016 at 3:07 p.m. and last printed at 2:53 p.m. the same day.

155.   Defendant Stevens printed the patient lists she sent to Todd Dear on July 1, 2016.

156.   Defendant Stevens took those printed patients lists from UMMC's premises.

157.   Defendant Stevens took those printed patient lists to MCAM.

158.   Defendant Stevens printed those patients list and took them to MCAM at Dr. Sullivan's request.

159.   Defendants used those printed patient lists at MCAM.

160.   UMMC neither knew nor could have possibly known or suspected of such treachery in the Batson HTC at the time it happened. UMMC did not discover this egregious theft of trade secret information until much later.

*Discovery of the Trade Secret Theft*

161.     In June 2018, approximately one year after UMMC sued Dr. Sullivan for

violating his PSA, Dr. Sullivan sought to smear UMMC in the public eye. He was making good

on his promise to fight the battle in the "court of public opinion." He enlisted the assistance of

the Clarion Ledger in publishing a story about the lawsuit. The article, titled "Unhappy UMMC

pediatricians 'loot' to form own sub-specialty practice, lawsuits ensue' published on June 4,

2018. *See Clarion Ledger article, attached as Exhibit 32.*

162.     Dr. Sullivan made the article as inflammatory as possible with the hopes of

deterring UMMC from pursuing the lawsuit. He never expected that the article would bring his

trade secret theft to light.

163.     Defendant McMillan's now ex-husband read the article and it confirmed a

suspicion he developed in the summer of 2016. As explained in his affidavit, during the summer

of 2016, Aubrey McMillan found a list of patients in Defendant McMillan's vehicle. She had

recently started her new job at MCAM. Aubrey McMillan was concerned about such a list with

so much patient information being left behind in Defendant McMillan's vehicle and he took the

list into his possession. He faxed a copy of this list to Medicaid and called them to discuss it.

Shortly afterwards, according to Aubrey McMillan, someone from the Medical Licensure Board

contacted him and advised him he was violating HIPAA by having this list in his possession. The

call frightened Aubrey McMillan. He scratched out the date stamp at the bottom of the list and

stored the list in a bank safety deposit box.

164.     Two years later, when he read the Clarion Ledger article, Mr. McMillan suspected

the list was connected to that article. He was right. He turned over the list to UMMC's counsel

and signed the Affidavit attached as Exhibit 30. That list is the list Defendant Henderson sent to

Defendant Stevens on July 1, 2016. It has the same yellow highlights as prepared by Dr. Sullivan

and the same patient information. It's the same list – and the footer at the bottom confirms the

date it was printed: 6/29/2016. That's the same date the metadata shows the list was last printed.


*July 2016 to Present*

165.    Defendants created the patient list through by improperly accessing secure

UMMC databases to obtain that patient information for their personal use at MCAM, they took

the list from UMMC premises without authorization, and used the list for their personal benefit

and to UMMC's detriment. Defendants used the list for the purpose of facilitating, prescribing,

and dispensing hemophilia factor drugs, other drugs, and for other uses since MCAM opened its

doors on July 5, 2016.

166.    As soon as MCAM opened for business on July 5, 2016, Dr. Sullivan and MCAM

immediately began seeing patients, but it took a little time before they could actually dispense

factor drugs because of delays in payer approval and/or the need to build up an inventory.

167.    On July 7, 2016, Dr. Sullivan emailed the UMMC dental division about a patient

who needed dental work. Dr. Sullivan asked UMMC if they could see that patient the following

day, suggesting that this was an issue that needed to be promptly addressed. UMMC saw that

patient the following day (July 8, 2016.) UMMC dentists determined that patient needed a tooth

extraction and scheduled the patient for that procedure on July 21, 2016. However, Dr. Sullivan

was unable to dispense that patient's factor drug in time for that procedure, so he asked UMMC:

Can we do this next week? We need a little time to get her factor.

*See email thread attached as Exhibit 36.*

168.    On October 24, 2016, Brad Gilchrist with Vital Care pharmacy in Meridian emailed Dr. Sullivan regarding the factor drug Eloctate. In the email bearing the subject "Eloctate patients", Gilchrist said:

> Dr. Sullivan,
>
> It looks like Prime is changing the reimbursement of Eloctate on the state of Mississippi Health Plan. We will end up losing a lot of money on those patients, if we keep them. Is there an alternative product you would use for them? If so, I would like to check on the reimbursement for the alternative product (before we triage them to Prime).
>
> Thanks,
> Brad

Dr. Sullivan responded to Gilchrist the following day, and he copied his wife (and still UMMC employee Lisa Sullivan) and Defendant Stevens on the email. Dr. Sullivan's response was:

> Linnea, Sue,
>
> Please let me know when [patient name] and [patient name] call to reorder. I'd like to discuss options with them.
>
> Thank you,
>
> Spencer

*See email thread attached as Exhibit 37.*

169.    That email exchange between Dr. Sullivan and Gilchrist shows that Dr. Sullivan is in the unique position where he can manipulate pharmacy income through his treatment decisions. Dr. Sullivan previously prescribed Eloctate to those two patients, but when the reimbursement rate changed, he wanted to discuss "options" with those patients so he could switch them to a different factor drug with a better reimbursement rate.

170.    MCAM also paid bonuses to Defendants McMillan, Stevens, and Henderson for the profits MCAM generated in 2016, 2017, 2018, and 2019.

43

171.    In 2018, MCAM obtained a federal HTC designation from the Centers for Disease Control.

172.    MCAM is the only for-profit Hemophilia Treatment Center in the entire United States.

173.    The other 150 HTC's are either public institutions or 501(c)(3) charitable entities.

174.    Given the immediate extraordinary profits MCAM and Dr. Sullivan reaped from dispensing hemophilia drugs, it's no surprise that Dr. Sullivan took his staff out for margaritas to celebrate acceptance into the Mississippi Medicaid Program. *Email from Spencer Sullivan to Lisa Sullivan dated July 20, 2016 is attached as Exhibit 33.*[20]

### COUNT ONE

### *VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030(A)(2)*

175.    UMMC's computers and computer systems, including without limitation its email and computer servers, are used in interstate commerce or communication and are "protected computers" under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).  Specifically, those computer systems are used to communicate in interstate commerce and to transmit information to and from persons at UMMC in the State of Mississippi to persons and entities in states outside of Mississippi.

176.    As detailed above, Defendants, directly and through their agents and the other Conspirators, accessed UMMC's protected computers to observe, copy, download, print, collect or otherwise misappropriate confidential, private, trade secret and/or protected information and data for their benefit.

---

[20] The effective date of that enrollment is June 1, 2016 (thirty days before Dr. Sullivan left UMMC).

177.    For example and without limitation, Defendants created a Microsoft Excel spreadsheet using UMMC's password protected computer network that contained the identity of UMMC's patients as well as relevant treatment information for those patients.  Defendants took that Excel spreadsheet when they left UMMC in July 2016 and used it for their benefit once at MCAM.

178.    Defendants' access violated, among other things, the UMMC Information Security Policies, and was done for purposes of wrongfully and unlawfully obtaining the information from the protected computers for the illicit benefit of the Defendants and in furtherance of the unlawful objective of their conspiracy – to steal UMMC's confidential information to enrich themselves upon the establishment of Dr. Sullivan's new practice at MCAM.

179.    By accessing UMMC's protected computers and password protected databases, Defendants wrongfully obtained confidential, private, trade secret and/or proprietary information and data from UMMC's protected computers, including, but not limited to, patient information, patient payer data, reimbursement methodologies and formulas, pharmacy financial information, pharmacy product data, employee salary data, purchasing contracts, and UMMC's plans to provide outreach clinics around the State.

180.    Defendants, directly or through their agents, copied, obtained and sent proprietary trade secret information from UMMC's computer and computer systems without authorization and/or in excess of authorized access.

181.    Defendants' access to UMMC's protected computers without authorization and/or in excess of authorized access constitute violations of UMMC's rights by wrongful and dishonest means, methods and schemes as described above.

182.    UMMC has been required to spend substantial time and money to respond to, assess or otherwise address Defendants' access of UMMC's protected computers without authorization and/or in excess of authorized access.  Such sums have greatly exceeded the statutory minimum of $5,000.00.

183.    By the actions alleged above, Defendants knowingly and intentionally accessed a protected computer without authorization and/or in excess of authorized access and obtained information from a protected computer by conduct that involved an interstate communication.

184.    By the actions alleged above, Defendants caused a "loss," as that term is defined in the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(11), to UMMC of more than $5,000 in value during any one-year period, thus implicating the factors set forth in 18 U.S.C. § 1030(a)(5)(B)(i).

185.    Defendants' activity constitutes a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2).

186.    Based on the actions alleged above and any others revealed by discovery in this action, as a result of Defendants' wrongful, unlawful and unauthorized acts, UMMC is entitled to all damages permitted by 18 U.S.C. § 1030.

## COUNT TWO

### *VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030(A)(4)*

187.    By the actions alleged above, Defendants, directly or through their agents and the other conspirators, knowingly and with intent to defraud, accessed UMMC's protected computers and computer systems, without authorization and/or in excess of authorized access.

188.     Defendants' access violated, among other things, the UMMC Information

Security Policies, and was done for purposes of wrongfully and unlawfully obtaining the

information from the protected computers for the illicit benefit of Defendants and in furtherance

of the unlawful objectives of their conspiracy – to steal UMMC's protected proprietary

information to enrich themselves upon the establishment of Dr. Sullivan's new practice at

MCAM.

189.     By accessing UMMC's protected computers and password protected databases,

Defendants wrongfully obtained confidential, private, trade secret and/or proprietary information

and data from UMMC's protected computers, including, but not limited to, patient information,

patient payer data, reimbursement methodologies and formulas, pharmacy financial information,

pharmacy product data, employee salary data, purchasing contracts, and UMMC's plans to

provide outreach clinics around the State.

190.     Each time Defendants logged into and accessed UMMC's computer network

using their Logon IDs or passwords for purposes of wrongfully obtaining or transmitting

information, they made a material misrepresentation, which they knew UMMC intended to rely

on, by affirming that they were accessing the network in compliance with the UMMC

Information Security Policies then in effect.

191.     By the actions alleged above, Defendants furthered the intended fraud by

continuing to obtain unauthorized use of UMMC's protected computers and computer systems,

and they obtained things of value – the confidential documents and trade secrets that they stole

from UMMC -- and they caused a "loss," as that term is defined in the Computer Fraud and

Abuse Act, 18 U.S.C. § 1030(e)(11), to UMMC of more than $5,000 in value during any one-

year period, thus implicating the factors set forth in 18 U.S.C. § 1030(a)(5)(B)(i).

192.    Defendants' activity constitutes a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

193.    Based on the actions alleged above and any others revealed by discovery in this action, as a result of Defendants' wrongful, unlawful and unauthorized acts, UMMC is entitled to all damages permitted by 18 U.S.C. § 1030.

## COUNT THREE

### *CONSPIRACY TO VIOLATE THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030(A)(4)*

194.    As set forth above, each of the Defendants, Sullivan, McMillan, Stevens, Henderson, and/or MCAM worked in conjunction with one another to illegally and unlawfully access UMMC's protected computers to observe, copy, download, print, collect or otherwise misappropriate confidential, private, trade secret and/or protected information and data for their benefit.

195.    Defendants' actions constitute a conspiracy to violate the Computer Fraud and Abuse Act as set forth in 18 U.S.C. § 1030(b).

196.    Based on the actions alleged above and any others revealed by discovery in this action, as a result of Defendants' wrongful, unlawful and unauthorized acts, UMMC is entitled to all damages permitted by 18 U.S.C. § 1030.

## COUNT FOUR

### MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE FEDERAL TRADE SECRETS ACT, 18 U.S.C. § 1836, 1839

197.    Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM misappropriated through improper and illegal means proprietary and confidential information belonging to and owned by UMMC that includes, but is not limited to, patient information, patient lists, patient payer data, reimbursement methodologies and formulas, pharmacy financial

information, pharmacy product data, employee salary data, purchasing contracts, and UMMC's plans to provide outreach clinics around the State.

198.    These items constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3) as they are financial, business, scientific, technical or economic information that derive independent economic value, both actual and potential, to UMMC from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of that information.

199.    Defendants, collectively and/or individually, used that misappropriated information on and after July 5, 2016, they continue using it to the present, and will continue using it into the indefinite future.

200.    In addition, these trade secrets are related to products and services used in, or intended for use in, interstate commerce.  For example, and without limitation, many of the trade secrets relate to pharmaceutical products that are manufactured in other states and shipped to Mississippi and dispensed to patients who are residents of Mississippi as well as states other than Mississippi.  Patients identified in the confidential patient lists reside outside of Mississippi and are residents of other states. Further, insurance payers that are identified in the patient lists, which pay for the factor drugs dispensed at MCAM are foreign corporations / foreign insurers and not residents of Mississippi.

201.    UMMC took reasonable measures to keep this information secret.  For example and without limitation, Defendants agreed to abide by the UMMC Information Security Policies that prohibited the use of this information for any purpose other than for the performance of the duties of Defendants while employed by UMMC.  Additionally, this information was stored in UMMC's protected computers and password protected databases to prevent unauthorized

disclosure and dissemination. UMMC also placed restrictions on the use of this information and other confidential information into the terms of Dr. Sullivan's PSA, which were conditions of Dr. Sullivan's employment at UMMC, and to which Dr. Sullivan obligated himself to abide by as a condition of that employment.

202.    Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM have obtained significant economic value from the misappropriation of UMMC's trade secrets to the detriment of UMMC including, but not limited to, receipt of salaries, bonuses, and significant revenue from their use of these trade secrets while employed with MCAM.

203.    The improper means employed by Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM include, but are not limited to, misappropriation of the above information, breaching their fiduciary duties to UMMC, and inducing others to breach their duties to UMMC to access and obtain the information, to remove that information from UMMC's premises, to take that information to MCAM, to use that information at MCAM, and other means as will be shown through discovery.

204.    Defendants Sullivan, McMillan, Stevens, Henderson , and/or MCAM acquired these trade secrets for their own benefit knowing that these trade secrets were acquired by improper means.

205.    Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM disclosed and used UMMC's trade secrets without express or implied consent after knowingly obtaining or deriving them from or through a person who had utilized improper means to acquire them.

206.    Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM disclosed and used UMMC's trade secrets without express or implied consent after knowingly acquiring

them under circumstances giving rise to a duty to maintain their secrets and limit their use to their duties performed on behalf of UMMC.

207.    Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM disclosed and used UMMC's trade secrets without express or implied consent after knowingly deriving them through persons who owed at duty to UMMC to maintain their secrets and limit their use to duties performed on behalf of UMMC.

208.    As a result of the misappropriation of UMMC's trade secrets by Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM, UMMC is entitled to all damages provided for by 18 U.S.C. § 1836(b)(3)(B) including, but not limited to, the actual loss sustained by UMMC as a result of the misappropriation of its trade secrets, the unjust enrichment received by Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM, and reasonable royalties for Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM's unauthorized use and/or disclosure of UMMC's trade secrets.

209.    Because the misappropriation of UMMC's trade secrets was willful and malicious, pursuant to 18 U.S.C. § 1836(b)(3)(C), UMMC is also entitled to exemplary and punitive damages from Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM.

210.    Because the misappropriation of UMMC's trade secrets was willful and malicious, pursuant to 18 U.S.C. § 1836(b)(3)(D), UMMC is also entitled to its reasonable attorneys' fees from Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM.

### COUNT FIVE

### CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS IN VIOLATION OF THE FEDERAL TRADE SECRETS ACT, 18 U.S.C. § 1832(A)(5)

211.    As set forth above, Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM acted in concert to steal and misappropriate through improper and illegal means trade secrets belonging to and owned by UMMC.

212.    Defendants' acts constitute an unlawful conspiracy in violation of 18 U.S.C. § 1832(a)(5).

213.    As a result of the conspiracy among Defendants to steal and misappropriate UMMC's trade secrets, UMMC is entitled to all damages provided for by 18 U.S.C. § 1836(b)(3)(B) including, but not limited to, the actual loss sustained by UMMC as a result of the misappropriation of its trade secrets, the unjust enrichment received by Defendants Sullivan, McMillan, Stevens, Henderson, and/or MCAM, and reasonable royalties for Defendants' unauthorized use and/or disclosure of UMMC's trade secrets.

### DAMAGES

214.    As a direct and proximate result of Defendants' conduct, as set forth herein and as will be developed during discovery and trial, UMMC is entitled to recover the following elements of damages:

(1)    Compensatory damages;

(2)    Consequential damages;

(3)    Exemplary damages;

(4)    Unjust enrichment;

(5)    Disgorgement;

(6)    Reasonable royalties;

(7)     Punitive damages;

(8)     Attorney's fees;

(9)     Pre-judgment interest;

(10)    Post-judgment interest;

(11)    Court costs; and

(12)    All other relief deemed proper in the premises.

WHEREFORE PREMISES CONSIDERED, Plaintiff UMMC respectfully requests a trial by jury and prays that a judgment be entered against Spencer K. Sullivan, M.D., Mississippi Center for Advanced Medicine, P.C., Linnea McMillan, Sue Stevens, and Rachel Henderson Harris, jointly, severally, or jointly and severally as applicable, for all damages UMMC is entitled to recover as a matter of law. UMMC further prays for all other relief, both legal and equitable, to which UMMC may be entitled as shown by the evidence.

Respectfully submitted this 28th day of June, 2019.

The University of Mississippi Medical Center


By: */s/Phil B. Abernathy*_____
          Phil B. Abernethy, MSB 1023

Counsel for UMMC:

Phil B. Abernethy, MSB 1023
Robert M. Frey, MSB 5531
Benjamin M. Watson, MSB 100078
Caroline B. Smith, MSB 105501
Butler Snow LLP
1020 Highland Colony Parkway, Suite 1400
Ridgeland, Mississippi 39157
Telephone: (601) 948-5711
Facsimile: (601) 985-4500

Robert V. Greenlee, MSB 100638
Robert V. Greenlee, Attorney at Law, P.A.
660 Lakeland East, Suite 200
Flowood, Mississippi 39232
Telephone: (601) 863-8221
Facsimile: (601) 863-8231
Email: robert@whitfieldlaw.org
48282285.v1