**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**THE UNIVERSITY OF MISSISSIPPI**                                    **PLAINTIFF**
**MEDICAL CENTER**

**VS.**                                    **CIVIL ACTION NO. 3:19-CV-00459-CWR-LGI**

**SPENCER K. SULLIVAN, M.D.;**
**MISSISSIPPI CENTER FOR ADVANCED MEDICINE, P.C.,**
**LINNEA MCMILLAN; KATHRYN SUE STEVENS, and**
**RACHEL HENDERSON HARRIS**                                    **DEFENDANTS**

---

**MEMORANDUM IN SUPPORT OF UMMC'S MOTION FOR DEFAULT JUDGMENT**
**BASED ON PERJURY, SPOLIATION, AND CONCEALMENT OF EVIDENCE**

---

Plaintiff University of Mississippi Medical Center ("UMMC") submits this memorandum in support of its motion for default judgment based on perjury, spoliation, and concealment of evidence against Mississippi Center for Advanced Medicine, P.C. ("MCAM"), Dr. Spencer Sullivan, Linnea McMillan, R.N., and Kathryn Sue Stevens, R.N.

**INTRODUCTION**

While still employed at UMMC, Dr. Sullivan instructed Linnea McMillan, R.N., Sue Stevens, R.N., and social worker Rachel Henderson Harris to prepare a spreadsheet with individually identifiable health information for 170 UMMC patients. "The List," they called it. They stole the List, then used it to solicit patients and prescribe hemophilia medicine that Dr. Sullivan dispensed from his private pharmacy at MCAM. Since July 2016, MCAM has generated $78 million dollars in gross revenue (and $20 million in net profit) from dispensing hemophilia medicine to the patients on the List. Dr. Sullivan is MCAM's sole owner, and he reported more than $1.1 million in personal income after MCAM's first six months of operation alone.

1

It is a federal felony to steal individually identifiable health information, especially when it is used for commercial advantage or personal gain, and it is punishable by up to 10 years in prison and a $250,000 fine. *42 U.S.C. § 1320d-6*. So, when UMMC filed its state court lawsuit against Dr. Sullivan and MCAM in July 2017, Defendants orchestrated a plan to conceal their conduct. They destroyed the List, then lied in their state court depositions about taking the List to MCAM or using it at MCAM. Dr. Sullivan and MCAM made false statements in their discovery responses by denying taking the List or any other patient information to MCAM. They then concealed evidence that contradicted their lies, including the text messages that ultimately exposed the fraud.

The cover up didn't stop when UMMC filed this federal lawsuit. Instead of owning up, Defendants doubled down. They indignantly protested the federal lawsuit as unnecessary because discovery was occurring in state court. They filed a motion to dismiss that portrayed Dr. Sullivan as a victim, claiming the lawsuit was "nothing more than an ill-conceived effort to harass" him, while repeatedly referencing the false state court deposition testimony and false discovery responses as a reason this Court should abstain from exercising jurisdiction. They also asked the Court to disallow UMMC from conducting any federal discovery because it would be "duplicative" with the state court discovery. However, Defendants never informed this Court that the deposition testimony and discovery responses they so adamantly wished to protect were willfully false. Then, when UMMC propounded discovery to Defendants in this federal action, they incorporated their false state court discovery responses without disclosing their falsity, they again represented that they did not take the List to MCAM, and they again concealed evidence that contradicted their lies. That is a fraud on *this* Court.

Defendants' plan collapsed when former Defendant Harris hired her own counsel, independent from the collective defense, and exposed the fraud. Harris produced thousands of responsive text messages that the others claimed did not exist and admitted her own perjury. Now that Harris ruined Defendants' Plan A (fraud), Defendants want to pretend it never happened and simply move to Plan B which involves multiple conflicting stories that are all bolstered by the fact that Defendants destroyed the stolen records.

These circumstances show exactly why this Court has the inherent authority to protect the integrity of the judicial process and to enter a default judgment if (1) there is a clear record of delay or contumacious conduct and (2) lesser sanctions would not serve the best interests of justice. *Taylor v. Consolidated Pipe & Supply Co.*, 2017 WL 3090317 at *2 (S.D. Miss. July 20, 2017) (*citing Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011)). As shown below, what began as a fraud upon the state court has evolved into a fraud upon this Court.

**FACTS**

**A.  The origin of MCAM.**

For nearly 20 years, UMMC treated children and adults with hemophilia at its Hemophilia Treatment Center ("HTC") in the Jackson Medical Mall. Hemophilia is a rare and incurable genetic condition that prevents blood from clotting, and the standard treatment is to replace the missing clotting factors through intravenous factor replacement drugs ("factor").

In July 2014, UMMC hired Dr. Sullivan as the new HTC Medical Director. His employment was predicated on a Physician Recruitment Agreement where he promised he would not terminate his employment for any reason within three years. [ECF 1-2, at ¶ 2]. Also, as a condition of Dr. Sullivan's employment, he and UMMC entered into a Professional Services Addendum where Dr. Sullivan expressly promised he would not steal patient information, or

3

otherwise use patient information for the benefit of himself or another entity, including to solicit patients. [ECF 1-3, at ¶¶ 11-13]. In January 2016, eighteen months into his three-year commitment, Dr. Sullivan obtained confidential financial information showing the revenue UMMC generated from dispensing factor. [Exhibit 1; email]. The very next day, he emailed his lawyer about starting his own for-profit hemophilia clinic and pharmacy. [Exhibit 2; email]. Within weeks, Dr. Sullivan had established MCAM and installed himself as MCAM's sole owner, president, secretary, treasurer, and chief executive officer. [Exhibit 3; corporate records].

Dr. Sullivan's business plan for MCAM was simple: write factor prescriptions to hemophilia patients from UMMC, then dispense it from MCAM's pharmacy instead of UMMC's pharmacy. [Exhibit 4; business plan]. For six months, while still employed at UMMC, he quietly laid the groundwork using UMMC's computers, UMMC's records, and UMMC's email account. He also hired HTC employees McMillan, Stevens, and Harris.[1] Then, two weeks before leaving UMMC, Dr. Sullivan instructed McMillan, Stevens, and Harris to access UMMC's electronic health record called EPIC and prepare a Microsoft Excel spreadsheet containing the information he needed to carry out his plan. [Exhibit 5; email]. The spreadsheet would contain the names of 170 UMMC patients together with the individually identifiable health information needed to solicit the patients and to prescribe factor to them (e.g. date of birth, medical diagnosis, factor product, dose and frequency, infusion method, insurance, pharmacy, home phone number, mobile phone number, and weight in kilograms) (the "UMMC Patient List" or the "List"). [Exhibit 6; email].

---

[1] Dr. Sullivan hired all the HTC employees except for administrative assistant Gwen Thompson.

Dr. Sullivan left UMMC on June 30, 2016, and opened MCAM the next business day.[2] The profits were immediate. During its first six months, MCAM generated $5 million of gross revenue from dispensing factor, of which Dr. Sullivan reported more than $1.1 million as personal income.[3] [Exhibit 7; 2016 tax return and 2016 MCAM financial statement].

### B.  The litigation begins.

UMMC delivered a preservation letter to Dr. Sullivan in February 2017 then filed suit in state court a few months later. [Exhibit 8; preservation letter] [Exhibit 9; Complaint]. In their Answer, MCAM and Dr. Sullivan flatly denied taking any patient information from UMMC. [Exhibit 10; Answer]. They repeated those denials in response to UMMC's First Amended Complaint. [Exhibit 11; motion to amend] [Exhibit 12; Dr. Sullivan's Answer] [Exhibit 13; MCAM's Answer]. Those denials show that the marching orders came from Dr. Sullivan.

### C.  The Clarion Ledger article and its unintended consequence.

After UMMC filed the lawsuit, Dr. Sullivan sent a series of anonymous letters to the Clarion Ledger expressing his negative opinions about UMMC. [Exhibit 14; anonymous letters]. Those letters led to the publication of a June 2018 article called "Unhappy UMMC pediatricians form sub-specialty practice, lawsuits ensue." [Exhibit 15; article]. The article referenced the theft of patient information allegation, and that produced a consequence that Dr. Sullivan surely did not intend.

The article came to the attention of McMillan's ex-husband Aubrey McMillan, who then contacted UMMC's counsel to inform that he found a list of patients in a vehicle driven by McMillan during the summer of 2016. [Exhibit 16; Affidavit]. Aubrey McMillian still had the

---

[2] McMillan's last day at UMMC was also June 30th followed by Stevens on July 1st and finally Harris on July 6th.

[3] Dr. Sullivan's salary at UMMC was $175,000 per year.

list in his possession, and he suspected it was related to the article and the lawsuit. He was right -

it was the List. In his July 2, 2018 Affidavit, Aubrey McMillan also explains that he "had heard

[McMillan] talk about million-dollar patients."[4] [Exhibit 16; at ¶ 8]. This made the List the focal

point of the lawsuit.

### D. Linnea McMillan's testimony.

McMillan was the first MCAM employee to testify. She knew her ex-husband had

returned the List to UMMC's counsel, and she came prepared with elaborate explanations for

how he may have obtained it, none of which involved her (e.g. computer hacking, obtaining it

directly from UMMC, and that he created it himself). [Exhibit 17; McMillan's January 24, 2019

deposition, at pgs. 168-169]. Ultimately, McMillan denied taking, possessing, or using the List at

MCAM:

> Q: Did you ever input any data into this list?
> A: No, because I don't know how to work Excel.
> Q: But in the email, Dr. Sullivan is instructing you at the bottom – he
>    is telling either you or Sue to update or complete the highlighted
>    field in yellow, add weight in kilograms. Was that ever done?
> A: I can't answer that. I have no idea.
>                              ***
> Q: Do you know where this list came from?
> A: No.
> Q: So you did have a copy of this list after you left UMC, correct?
> A: No.
>                              ***
> Q: Do you recall ever having this list in your possession after you left
>    UMC?
> A: No.
> Q: Did you ever have this list in your possession?
> A: No.
>                              ***
> Q: Does a copy of this list in front of you, [the UMMC Patient List],
>    exist at MCAM?
> A: No.
> Q: Did a copy of this ever exist at MCAM?

---

[4] Approximately $35 million of MCAM's revenue was generated from seven (7) former UMMC patients
with severe hemophilia.

> A: No.
> Q: Is it your testimony that this list and all the information in it was
>    never used at MCAM?
> A: That's my testimony, yes.

[Exhibit 17; at pgs. 156-161; 177-178]. To buttress her testimony, McMillan explained that the

list was prepared for UMMC's benefit, and not MCAM's:

> Q: Were you concerned that Dr. Sullivan was asking you to update this
>    list two weeks before his departure to MCAM?
> A: No.
> Q: Why not?
> A: We were trying to prepare whoever would be seeing these patients
>    the best we could to – it's very difficult if these patients don't know
>    how to obtain their own medication. It's not like you can drive down
>    to the Walgreens and pick this up. This is a specialty drug, and its
>    very unique. And had – If we ever had a patient come through on a
>    weekend or a holiday, I have no doubt they would call Dr. Sullivan
>    at home trying to figure out how to get the patient their medicines
>    because the general population would have no clue where to start.

[Exhibit 17; at pg. 157]. The President and CEO of MCAM, Dr. Spencer Sullivan, attended

McMillan's deposition. Although he heard every word, and knew McMillan was lying, he said

nothing, and did nothing, to correct her testimony.[5]

**E. Sue Stevens' testimony.**

UMMC deposed Stevens the day after McMillan. Stevens also denied preparing the List

and denied any knowledge of the List going to MCAM:

> Q: Ms. Stevens, back to [the UMMC Patient List], do you know who,
>    if anyone, updated the fields as requested by Dr. Sullivan?
> A: I do not recall.
> Q: But you didn't update them, as far as you know?
> A: I don't recall.
>                              ***
> Q: Did you print this list on July 1st, 2016?
> A: No.
> Q: Did you take a copy of this list with you either in paper form or in
>    electronic form when you left UMC?

---

[5] The text messages exchanged between Dr. Sullivan and Jordan Robinson during this deposition are the
subject of a pending motion to compel. [ECF 152, 153, 159, and 162].

> A: No.
> Q: Do you know if anyone took a copy of this list with them from UMC in either paper form or electronic form after it was generated?
> A: I do not know.

[Exhibit 18; Stevens' January 25, 2019 deposition, at pgs. 117-120, 142-143]. Stevens also swore

that the List was created for UMMC's benefit and not for use at MCAM:

> Q: Then why would he ask for it [the UMMC Patient List], if you know?
> A: To aid his co-physicians that would be taking over the care of these patients.

[Exhibit 18; at pg. 119]. Dr. Sullivan did not attend Stevens' deposition, but did nothing to

correct her testimony after he became aware of it.

### F. Rachel Harris' testimony.

UMMC deposed Harris on February 25, 2019. Once again, the President and CEO of

MCAM, Dr. Spencer Sullivan, was in attendance. Harris stuck to the plan:

> Q: And that is why you brought the list to MCAM, so that you could facilitate patient - - care at MCAM?
> A: No list was taken to MCAM. We didn't need a list. The patients were going to follow us that wanted to follow us.
> ***
> Q: Is it your testimony that you did not need this information that's contained in your list - I'm talking about [the UMMC Patient List] – that y'all did not need this information to continue patient care at MCAM?
> A: It's my testimony that we did not need it, nor did we take it. We did not need it.
> ***
> Q: Now, you also said you did not take the list. Is that your testimony?
> A: That is my testimony.
> Q: Did you ever see this list at MCAM?
> A: No.
> Q: Did anyone at MCAM ever talk about a patient list?
> A: No.

[Exhibit 19; Harris' February 25, 2019 deposition, at pgs. 318-321]. Harris also testified that the

List was prepared for UMMC's benefit and not for use at MCAM:

> Q: Did you tell anyone at UMC that Dr. Sullivan had asked you to complete this list?
> A: No.
> Q: Did you ask permission from anyone at UMC as to whether you could complete this list for Dr. Sullivan?
> A: This – this would have been completed for the clinic.
> Q: How do you know that?
> A: Because that's what we always completed it for.
> Q: Okay. And you would say the same thing at this time as well, correct?
> A: Yeah. I mean, I thought with the – with the potential of patients being in limbo, that – and with Dr. Megason probably needing to know this information to give the patients the best quality of care – I mean, this would have taken UMC a long time to compile. And my assumption would be that he would forward to Dr. Megason or whoever is at the Cancer Clinic. Otherwise, because these people don't know – they don't know where their pharmacy is, they don't know what their dosing is, they don't know what they dose. They don't know virtually anything. So this would be very helpful if it was passed along to somebody at UMC. I would think they would be thankful, if that's what he was sending it to.

[Exhibit 19; at pgs. 304-306]. In sum, McMillan, Stevens, and Harris each denied taking the List

to MCAM or using the List at MCAM and each gave the same alternative explanation for

creating the List.

There are only two ways the same story can come from multiple witnesses: either they

are telling the truth, or they are telling a lie, agreed upon in advance. Given that their story was

false, it was agreed upon in advance. Dr. Sullivan's role in that agreement may be discerned

from his previous denials and the text message Harris sent to McMillan and Stevens at the

conclusion of her deposition:



Dr. Sullivan and Harris' counsel were the only persons from her side who attended the deposition, so the "[t]hey" who "said we all did good" had to include Dr. Sullivan.

### G.  Dr. Sullivan's continued denials.

After the depositions of McMillan, Stevens, and Harris, UMMC propounded requests for admission about the List to Dr. Sullivan. Emboldened by his employees' perjured testimony, Dr. Sullivan unequivocally denied using, possessing, or even seeing the List at MCAM, as shown in his August 23, 2019 responses:

> **Request No. 44:** Admit that you saw the original of, or a copy of, [the UMMC Patient List] during the first year of your employment at Mississippi Center for Advanced Medicine, P.C.
> **Response: Denied**.
>
> **Request No. 45:** Admit that you possessed the original of, or a copy of, [the UMMC Patient List] during the first year of your employment at Mississippi Center for Advanced Medicine, P.C.
> **Response: Denied.**
>
> **Request No. 46:** Admit that you used the original of, or a copy of, [the UMMC Patient List] during the first year of your employment at Mississippi Center for Advanced Medicine, P.C.
> **Response: Denied.**

[Exhibit 20; Dr. Sullivan's RFA responses (emphasis added)].[6] UMMC also served Dr. Sullivan with these document requests:

> **Request No. 4:** Please produce all documents and data taken by you, or by anyone at your direction, or with your knowledge, from the University of Mississippi Medical Center.
>
> **Request No. 5:** Please produce all patient lists, patient spreadsheets, patient medical records, and patient information taken by you, or by anyone acting at your direction, or with your knowledge, from the University of Mississippi Medical Center.

Dr. Sullivan's September 9, 2019 responses incorporate the following affirmative representation:

---

[6] The exhibit used in these Requests for Admission is the UMMC Patient List included in Exhibit 16.

> [Dr. Sullivan] responds that he did not purposefully take any documents or data from UMMC, he did not direct anyone to take any documents or data from UMMC, and he did not know of anyone acting at his direction or with his knowledge who took any documents or data from UMMC, and therefore, if that is the question posed in this request he has no responsive documents.

[Exhibit 21; Dr. Sullivan's RFP responses]. Dr. Sullivan joined the cover up by denying that he or anyone else took any patient information, including the List, from UMMC.

### H.  MCAM's denials.

After the depositions of McMillan, Stevens, and Harris, UMMC also propounded these requests to MCAM:

> **Request No. 2:** Please produce all Documents, electronically stored information, and tangible things obtained or taken by You, or by anyone acting at Your direction, or with Your knowledge, from the University of Mississippi Medical Center at any time on or before July 7, 2016.

> **Request No. 3:** Please produce all patient lists, patient spreadsheets, patient medical records, and patient information obtained or taken by You, or by anyone acting at Your direction, or with Your knowledge, from the University of Mississippi Medical Center at any time on or before July 7, 2016.

[Exhibit 22; MCAM's RFP responses]. MCAM's September 9, 2019 responses include this affirmative representation:

> [MCAM] responds that it did not purposefully take any documents or data from UMMC, it did not direct anyone to take any documents or data from UMMC, and it did not know of anyone acting at its direction or with its knowledge who took any documents or data from UMMC, and therefore, if that is the question posed in this request it has no responsive documents.

By that time, MCAM, Dr. Sullivan, McMillan, Stevens, and Harris were firmly entrenched into their collective lie that they did not take any patient information, including the UMMC Patient List to MCAM. No one else was involved with preparing the List and no one

else could have brought it to MCAM. By collectively denying taking the List and using it at MCAM, Defendants had concocted the best possible defense because the trade secrets claim requires UMMC to prove theft and use of the trade secrets.

## I.   Defendants continued their scheme in this federal action.

UMMC filed this federal action in June 2019 and asserted claims arising under the Computer Fraud and Abuse Act 18 U.S.C. § 1030 and the Federal Defend Trade Secrets Act 18 U.S.C. § 1836. [ECF 1]. In response, Defendants sought to dismiss this action as "duplicative" because it "involves substantially the same issues and parties." [ECF 13, at pg. 17]. Defendants emphasized the volume of state court discovery as a reason the Court should abstain, and they specifically identified the depositions of McMillan, Stevens, and Harris, and Dr. Sullivan's and MCAM's discovery responses as discovery they should not have to "duplicate" in the federal action. [ECF 13, at pgs. 6, 23]. Defendants knew their testimony and discovery responses were willfully false and they knew they had destroyed the stolen information, but they did not disclose that to the Court when they asked it to abstain.

Defendants also asked the Court to stay federal discovery while the motion to dismiss was pending. [ECF 24]. In that motion, Defendants again emphasized the volume of state court discovery as the reason this Court should deny federal discovery. They specifically identified the depositions of McMillan, Stevens, and Harris, and Dr. Sullivan's and MCAM's discovery responses, without disclosing their falsity. In fact, Defendants characterized Plaintiff's efforts to engage in federal discovery as "entirely duplicative of discovery that is already occurring in the state court action," then boldly asserted "[t]his is an important point that deserves to be restated: discovery is ongoing in the state court action." [ECF 24 at pg. 9]. In fact, Magistrate Judge Anderson accepted Defendants' representations about "duplicative discovery" and incorporated

it into her December 6, 2019 text order which provided, in part "parties are not required to duplicate any discovery previously provided." Knowing that the state court discovery was part of an orchestrated cover up, Defendants even argued that "a stay is in harmony with Rule 1's call for the 'just, speedy, and inexpensive determination of every action and proceeding" while concealing the unjustness of their plan. [ECF 24, at pg. 9]. Defendants brought their scheme into this Court by concealing the falsity of their prior testimony and discovery responses, then using that same discovery to convince this Court to deny UMMC the ability to uncover the truth.

After the briefing ended on Defendants' motions, they continued their scheme into the federal discovery process. In January 2020, UMMC propounded this federal discovery to each Defendant:

> **Request No. 1:** All Patient Information obtained during your employment at UMMC.[7]
>
> **Request No. 2:** All Communications regarding Patient Information obtained during your employment at UMMC.[8]
>
> **Request No. 3:** All Communications regarding the discovery of a patient list in Linnea McMillan's vehicle.
>
> **Request No. 4:** All Patient Information brought from UMMC to MCAM.
>
> **Request No. 5:** All Communications regarding any Patient Information brought form UMMC to MCAM.

[Exhibit 23; Defendants' RFP responses]. In their February 10, 2020 responses, Defendants produced nothing: no documents, no text messages, no emails, no patient lists, no medical records. Instead, Defendants protested and claimed the requests "[sought] the same documents

---

[7] The term "Patient Information" was defined as "written information in any form, electronic or non-electronic, that contains health information of any patient who received medical treatment at UMMC. This term specifically includes patient lists, patient spreadsheets, and medical records."

[8] The term "Communication" was defined as "written communications in any form, electronic or non-electronic, including emails, text messages, instant messages, letters, reports, memoranda, and records."

that have already been sought in the state court action that is a mirror image to this federal action" and they incorporated their responses to the state court discovery into their federal responses. Those are the same state court responses where Dr. Sullivan and MCAM represented they "did not purposefully take any documents or data from UMMC, did not direct anyone to take any documents or data from UMMC, and did not know of anyone acting at [their] direction or with [their] knowledge who took any documents or data from UMMC." [Exhibits 21 and 22]. Meanwhile, McMillan, Stevens, and (purportedly) Harris contended they had no responsive documents.

Defendants' federal responses also include the statement "if any documents exist outside of those already produced in the state court action, Defendants will produce them." However, Defendants produced no responsive documents in the state court action either, so UMMC followed up and asked whether any responsive documents existed, and if so, when they would be produced.[9] In response, Defendants' counsel replied, in part, "None exist." [Exhibit 24; defense counsel email]. But they did exist.

**J.  Rachel Harris hired new counsel and exposed the scheme.**

By March 2020, Harris had disassociated from her co-Defendants in this lawsuit, hired her own independent counsel, and produced 1,469 pages of previously unproduced text messages. [Exhibit 25; Harris' supplemental RFP responses]. The texts directly contradicted Defendants' prior testimony and denials and exposed the plan to conceal. [Exhibit 26; Harris texts]. Some of the clearest examples relate to an incident that happened in September 2016 involving the Mississippi Board of Medical Licensure, and which circles back to Aubrey McMillan's affidavit.

---

[9] Dr. Sullivan and MCAM did produce 48 pages of random documents that they claimed to have found while looking for responsive information.

In Aubrey McMillan's affidavit, he testified that after finding the List in McMillan's vehicle, he faxed it to Medicaid which prompted a phone call to Mr. McMillan from the Mississippi Board of Medical Licensure. [Exhibit 16; at ¶ 9]. The Board also called Dr. Sullivan, and that triggered a flurry of text messages among McMillan, Stevens, and Harris about the List, including these:




[Exhibit 26; at pgs. 12-23]. UMMC then sent requests for admission to Harris. In response, Harris admitted that she, Stevens, McMillan, and Dr. Sullivan all possessed and used the UMMC Patient List at MCAM, and that she lied in her deposition. [Exhibit 27; Harris' RFA responses]. They all lied.

**LEGAL STANDARD**

This Court has the inherent authority to impose sanctions for bad faith conduct or willful abuse of the judicial process where other rules do not provide an adequate remedy. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991). "Reliance on this inherent authority is appropriate when there is a wide range of willful conduct implicating multiple rules," or "when the conduct at

issue is altogether beyond the reach of the rules." *Sarco Creek Ranch v. Greeson*, 167 F.Supp.3d 835, 845 (S.D. Tex. 2016). The Court may enter a default judgment where (1) there is a clear record of delay or contumacious conduct and (2) lesser sanctions would not serve the best interests of justice. *Taylor*, 2017 WL 3090317 at *2 (*citing Brown*, 664 F.3d at 77).[10] Also, a default judgment becomes more appropriate when, as here, the objectionable conduct is that of the client, and not the attorney. *Brown*, 664 F.3d at 77. "Much like criminal sentencing, an appropriate discovery sanction will take into account principles of deterrence, restitution, and punishment in proportion to the significance of the violation." *Stewart v. Belhaven University*, 2017 WL 3995989 at *1 (S.D. Miss. Sep. 8, 2017).

**ANALYSIS**

### A.  Perjury

"The proper administration of justice depends on people testifying truthfully under oath." *Taylor*, 2017 WL 3090317 at *4 (*citing Brown*, 664 F.3d at 77). The Fifth Circuit has held that perjury is a "serious offense that constitutes a severe affront to the courts and thwarts the administration of justice" and is contumacious conduct. *Brown*, 664 F.3d at 77, 80. Perjury is defined as the "willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Rogers v. Medline Industries, Inc.*, 2018 WL 6683015 at *3 (S.D. Miss. Dec. 19, 2018) (*citing United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). McMillan, Stevens, Harris, and Dr. Sullivan each committed perjury.

---

[10] These cases addressed a dismissal with prejudice against a plaintiff which is viewed "interchangeably" with a default judgment against a defendant in the Fifth Circuit. *Sarco Creek*, 167 F.Supp.3d at 845 *citing Pressey v. Patterson*, 898 F.2d 1018, 1021 n.2 (5th Cir. 1990).

16

1. **Linnea McMillan committed perjury.**

After Harris produced the texts, UMMC deposed McMillan again and she confessed that

her prior testimony was false:

> Q: But you did – you said things in your deposition that were not true,
> didn't you?
> A: I did.
> Q: And you knew those things were not true when you said them, didn't
> you?
> A: I did.
> ***
> Q: Did you lie in your deposition?
> A: Yes.
> Q: Okay. You lied more than once in your deposition, didn't you?
> A: I lied about the list.

[Exhibit 28; McMillan's June 11, 2020 deposition, at pgs. 8-9]. In fact, when asked the same

questions that were asked in her first deposition, McMillan gave contradictory answers

(objections omitted):

> Q: Do you recall ever having [the UMMC Patient List] in your
> possession after you left UMC?
> A: It was at MCAM, yes.
> Q: Did you ever have it in your possession?
> A: At MCAM, yes.
> ***
> Q: And the next question was, "Did a copy of this list ever exist at
> MCAM?" And what was your answer [in the first deposition]?
> A: My answer was, "No."
> Q: What is your answer today?
> A: Yes.
> Q: The next question was, "Is it your testimony that this list and all the
> information in it was never used at MCAM?" What was your
> answer?
> A: My answer was, "Yes. That is my testimony."
> Q: What is your answer today?
> A: No.
> Q: Your answer today is that, yes, this list and the information in it was
> used at MCAM, right?
> A: That's what I'm saying.
> ***

[Exhibit 28; at pgs. 44-46, 49]. McMillan's false testimony was not the result of confusion,

mistake, or faulty memory. She knew the List was at MCAM and that she and the other

Defendants used it at MCAM:

> Q:  You used the list at MCAM, didn't you?
> A:  Yes.
> Q:  Rachel used the list at MCAM, didn't she?
> A:  Yes.
> Q:  Sue used the list at MCAM, didn't she?
> A:  Yes.
> Q:  Spencer Sullivan used the list at MCAM, didn't he?
> A:  Yes.

[Exhibit 28; at pg. 12]. McMillan also knew she was going to lie about the List before the first

deposition began:

> Q:  You also knew you were probably going to be asked questions that
>      you didn't really want to answer, right?
> A:  Probably.
> Q:  You knew we were going to ask about the patient list at that point?
> A:  Oh, yeah.
>                              ***
> Q:  You knew when you walked in that day, that you were not going to
>      tell the truth about the list, correct?
> A:  If – if that came up.

[Exhibit 28; at pgs. 175, 11]. McMillan willfully provided false testimony about the most

material issue in the case, which is the theft of the UMMC Patient List and its use at MCAM.

**2.  <u>Sue Stevens committed perjury.</u>**

After Harris produced the texts, UMMC deposed Stevens again, and she also confessed

that her prior testimony was false, as summarized here:

> Q:  Did you say anything in your deposition that was untrue?
> A:  I said that I did not know about a list bring brought to MCAM, and
>      I did know that Rachel Henderson [Harris] brought a list to MCAM.
> Q:  Your testimony that you did not know about that list was a lie,
>      wasn't it?
> A:  Yes.
>                              ***

Q: You participated in preparing [the UMMC Patient List]?

A: Yes.

\*\*\*

Q: And you sent that picture, correct?

A: I did.

Q: You took that picture with your phone and then texted it to the group?

A: Yes.

Q: So was this the only time you printed that UMC patient list, the one that's in the picture on this text?

A: To the best of my recollection, yes.

Q: And if you look at the bottom – if you look carefully at the bottom of that picture, you can see that it actually tells you the print date.

A: Print date of what?

Q: July 1, 2016.

[Exhibit 29; Stevens' June 9, 2020 deposition, at pgs. 11-12, 28, 93-94] [Exhibit 30; Stevens' July 1, 2016 patient list photo]. Stevens' false testimony was not the result of confusion, mistake, or faulty memory. She knew the List was at MCAM and that it was used at MCAM. As shown in Harris' texts, Stevens referred to the UMMC Patient List as "the list" and spoke of how "careful" she was with it. [Exhibit 26; at 556]. Stevens also knew UMMC did not have her text messages before her first deposition and it gave her the freedom to lie:

Q: You knew when you testified that we did not have this text message didn't you?

A: Yes, I believe that's correct.

Q: And if you knew we had this text message, you would have testified differently about whether or not that list existed at MCAM, wouldn't you?

A: I suppose so, yes.

[Exhibit 29; at pgs. 210-211]. Finally, Stevens' confession was derived from getting caught, not by any desire to tell the truth:

Q: Were you happy to see that someone had told Rachel that, "They got nothing on us"?

A: Yes.

\*\*\*

Q: After Rachel's deposition, did you feel like this was going to all go away?

19

> A:  Yes. I mean, it was the State lawsuit.
> Q:  And if it had all gone away, you would have never come forward to tell us that you lied in your deposition would you?
> A:  I – I don't know if I would or wouldn't.

[Exhibit 29; at pgs. 259-261]. Stevens willfully provided false testimony about the theft of the UMMC Patient List and its use at MCAM.

### 3.  **Rachel Harris committed perjury.**

Harris' texts prove that she also committed perjury, and she admitted her perjury in response to UMMC's requests for admissions. [Exhibit 27]. However, unlike the other Defendants, Harris produced the incriminating evidence and confessed her guilt without first being caught through other means. Harris' texts were invaluable to UMMC's search for the truth, and the record proves that the remaining Defendants would have never admitted to stealing patient information or using it at MCAM if Harris had not hired her own independent counsel and produced the texts.[11]

### 4.  **MCAM and Dr. Sullivan knew McMillan, Stevens, and Harris committed perjury.**

In May 2020, two months after Harris produced the texts, Dr. Sullivan and MCAM changed their stories, as shown by their identical supplemental discovery responses:

> **Original Response (in relevant part):** *** Defendant responds that he did not purposefully take any documents or data from UMMC, he did not direct anyone to take any documents or data from UMMC, and he did not know of anyone acting at his direction or with his knowledge who took any documents or data from UMMC, and therefore, if that is the question posed in this request he has no responsive documents.
>
> **Supplemental Response (in full):** Defendant is not in possession of any such documents other than those which have already been produced. **At one time, MCAM was in possession of a patient list and limited medical records obtained from UMMC.**

---

[11] This Court dismissed Rachel Harris as a Defendant but has retained jurisdiction over the settlement between UMMC and Harris. [ECF 94].

[Exhibit 31; Dr. Sullivan's supplemental RFP responses (emphasis added)] [Exhibit 32; MCAM's supplemental RFP responses]. This was the first time MCAM or Dr. Sullivan revealed the theft of the UMMC Patient List or medical records, but they did not explain why they did not disclose this information before Harris produced the texts, nor did they identify what the "limited medical records" entailed. Also, neither MCAM nor Dr. Sullivan revealed why the "patient list" and "limited medical records" were no longer in their possession. They were still hiding information.

Dr. Sullivan's cryptic supplementation forced UMMC to send additional discovery, including this interrogatory:

> **Interrogatory No. 8:** State in factual detail how you used the UMMC Patient List and the "limited medical records" at MCAM.

> **Response:** Defendant Sullivan states that the patient list and medical records were utilized to ensure continuity of care. Defendant Dr. Sullivan states that patients were called to confirm whether they were being seen at UMMC, MCAM, or another doctor. Records were also reviewed for clinical care. With respect to the emails, Dr. Sullivan did not use them.

[Exhibit 33; Dr. Sullivan's interrogatory responses]. Dr. Sullivan clearly knew that the List prepared at his instruction was taken to MCAM and used at MCAM. This means he knew all the necessary facts to know McMillan, Stevens, and Harris committed perjury. Dr. Sullivan personally attended two of the depositions and knew they were lying, but instead of stopping it, or correcting it, he joined them through his own false discovery responses.

## 5. **Dr. Sullivan committed perjury.**

Dr. Sullivan not only approved his employees' perjury, he committed his own perjury through his federal interrogatory responses. After Harris produced the texts, Dr. Sullivan revealed for the first time that he used "an external hard drive" to steal emails from UMMC:

> **Interrogatory No. 4:** With respect to the "patient list" and "limited medical records" referenced in Interrogatory No. 3, state in factual detail how MCAM acquired possession of those documents by identifying everyone involved with obtaining those documents from UMMC and the specific actions that each person took to obtain those documents from UMMC.
>
> **Response (in relevant part):** *** Dr. Sullivan further states to the best of his recollection that he had a patient list of his own which he printed at UMMC. Dr. Sullivan further states that he has emails from his time at UMMC that contain limited patient records that he obtained by copying his UMMC email onto an external hard drive prior to leaving UMMC.

[Exhibit 33]. This was the first time Dr. Sullivan revealed that he used an external hard drive to steal anything from UMMC, and the first time he revealed his theft of the UMMC email account (which contained approximately 19,000 emails plus attachments).[12] However, in his response to interrogatory 8 (cited above), Dr. Sullivan swore "[w]ith respect to the emails, Dr. Sullivan did not use them." That statement is false because he used the stolen emails to facilitate dispensing factor from MCAM's pharmacy.

On September 1, 2016, Dr. Sullivan prepared a medical record stating that patient JAL needed a refill on hemophilia medicine. [Exhibit 34; emails and medical record]. Dr. Sullivan then accessed the stolen UMMC emails and forwarded two of them to MCAM pharmacist Kayla Peeler. The two UMMC emails related to the same patient and were originally sent in September and November 2015 at UMMC. Dr. Sullivan forwarded them to the pharmacist with the message "in addition to sterile water, here's what else we occasionally send." That is Dr. Sullivan "using" the stolen emails for MCAM's benefit.

---

[12] This hard drive is the subject of a pending motion to compel. [ECF 152, 153, 159, and 162]. Also, the attachments to those emails contained earlier versions of the UMMC Patient List and other individually identifiable health information.

Dr. Sullivan's false testimony was not the result of confusion, mistake, or faulty memory. It was the result of his ongoing pattern of deception designed to obstruct the judicial process and, most importantly, to win at all costs, the importance of which is shown by this text he sent to Jordan Robinson: We are going to win, win, win. I'm having so much fun i almost feel guilty [Exhibit 35; Dr. Sullivan July 22, 2017 text].

## B. Spoliation

"A Court does justice by finding the truth. That search requires evidence. Intentionally destroying evidence, then, is more than a devious litigation strategy. It is a lethal attack on a Court's purpose, and it must be responded to in kind." *TLS Management & Marketing Services, LLC vs. Mardis Financial Services, Inc.*, 2018 WL 3673090 (S.D. Miss. Jan. 29, 2018). A party seeking sanctions based on spoliation of evidence must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed, (2) the evidence was destroyed with a culpable state of mind, and (3) the destroyed evidence was relevant for the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Barnett v. Deere & Co.*, 2016 WL 4544052 at *1 (S.D. Miss. Aug. 31, 2016).

After denying taking any patient information from UMMC or using it at MCAM, then getting caught lying, Defendants now admit they destroyed all copies of the UMMC Patient List and the stolen medical records. This destruction goes to the evidence at the heart of the case, it meets the elements of spoliation, and it further justifies the entry of a default judgment.

### 1. Defendants had a duty to preserve the stolen patient information.

"A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have been known that the evidence may be relevant." *Barnett*, 2016 WL 4544052 at *1. UMMC delivered a preservation letter to Dr.

Sullivan in February 2017 and filed its state court lawsuit in July 2017. [Exhibit 8]. According to

Defendants, they shredded the List and the stolen medical records "in the fall of 2017 through

early 2018." [Exhibit 33; at Int. 6]. By their own admission, Defendants destroyed the stolen

information after the state court litigation began. "A party should not be permitted to destroy

potential evidence after receiving unequivocal notice of impending litigation." *Id*. Accordingly,

Defendants had a duty to preserve the stolen information.

> 2. **The stolen patient information was destroyed with a culpable state of mind.**

The Fifth Circuit permits sanctions against the spoliator only upon a showing of bad faith

or bad conduct. *Id*. at \*4. In this context, "bad faith generally means destruction for the purpose

of hiding adverse evidence." *Id*. Here, the destruction of evidence was a component of a broader

cover up that included perjury and concealment. In fact, the first reference to the destruction of

evidence is in response to the Medical Licensure Board's inquiry about the List ("we better shred

those papers, asap!"). [Exhibit 26; at 554]. Also, after Defendants destroyed the List, they lied to

conceal the fact that they had taken the List.

The stolen patient information was not destroyed as part of a routine document retention

policy. In fact, MCAM's "compliance officer" Jordan Robinson testified that MCAM's policy is

to scan outside medical records into the patient's electronic health record and to retain them, but

these records were treated differently because they "were not obtained through normal process."

[Exhibit 36; Jordan Robinson deposition, at pgs. 251-257]. In other words, because they were

stolen. None of the stolen records were scanned into the patients' medical charts at MCAM, but

they were all destroyed after the litigation began.

Here, the documents at issue were not created at MCAM. They were created at UMMC

and stolen by MCAM, and the theft of that information is a material issue in the case. These

documents not only proved essential elements of UMMC's trade secrets claim, they were also evidence of a crime. Defendants destroyed the stolen information, then committed perjury by claiming they never took it, then concealed evidence that contradicted their lies. That is the definition of a culpable state of mind.

### 3. **The stolen patient information is relevant.**

The Fifth Circuit does not permit sanctions for spoliation unless the party seeking sanctions proves that "the spoliated evidence would have been relevant." *Id*. at *1. There can be no question that the List and stolen medical records are relevant. Those are the most important documents in this case – and they no longer exist. The presence of those documents at MCAM is direct evidence that MCAM stole them from UMMC, which is why Defendants destroyed them. Destroying the direct evidence forces UMMC to rely on circumstantial evidence which increases the complexity of the case, especially when used against multiple individuals who all tell the same false story under oath, and then all change their stories into multiple conflicting stories after getting caught lying. If the documents still existed there would be no question about what was stolen, and the absence of those records tips the scales in Defendants' favor. Destroying the stolen records was as much a part of the cover up as the perjury and concealment of contradictory evidence.

### C. **Default judgment is the only appropriate sanction.**

MCAM, Dr. Spencer Sullivan, Sue Stevens, and Linnea McMillan have committed fraud on this Court through a coordinated pattern of deception involving perjury, spoliation, and concealment of evidence. "Courts have a duty to protect the public and safeguard the judicial process." *Taylor*, 2017 WL 3090317 at *4 (*citing Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 106 (D. Md. 1989)). As this Court acknowledged in *Taylor*, the "Supreme Court explained more

than 70 years ago [that] tampering with the administration of justice … is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistent with the good order of society." *Id.* (*quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)).

In *Brown*, the Fifth Circuit addressed a case where a plaintiff had two separate actions pending, a state court case involving a personal injury and a federal Title VII case. *Brown*, 664 F.3d at 73. In his state court personal injury deposition, the plaintiff testified that he left his job because of his injury, but in his federal Title VII deposition, he testified he left his job because of harassment. The District Court dismissed the Title VII case with prejudice as a sanction for perjury, which the Fifth Circuit affirmed because "this explicitly contradictory deposition testimony leads only to the District Court's conclusion [that] Brown was caught lying under oath." *Id.* at 78. The Court found that "Brown deceitfully provided conflicting testimony in order to further his own pecuniary interests … and in doing so, undermined the integrity of the judicial process." *Id.* The same thing happened here except it was multiple people giving the same lie under oath.

The Court also agreed that a dismissal with prejudice was "necessary under deterrence and institutional integrity rationales." *Id.* Under the deterrence rationale, the Court stated that "not everyone like [plaintiff] will get caught, so when perjury is discovered, the penalty needs to be severe enough to deter such conduct." *Id.* And under the protection of the judicial process rationale, "the proper administration of justice depends on people testifying truthfully under oath." *Id.* Both rationales apply here. Three Defendants gave willfully false testimony while their boss Dr. Sullivan listened with approval. He then joined the false story through his own discovery responses, and through his own false federal interrogatory responses.

In *Taylor*, this Court addressed a case where a personal injury plaintiff falsely denied having similar physical complaints before the subject accident and she also misrepresented her prescription history. *Taylor*, 2017 WL 3090317 at *2. This Court imposed a dismissal with prejudice sanction because of the plaintiff's "lies about the severity of her injuries," even though the defendant was admittedly responsible for the underlying injury, and even though the plaintiff provided the defendant with a medical record authorization. *Id*. at *3. Ultimately, this Court "struggled to find, but [did] not see a less onerous sanction that would address [plaintiff's] pattern of conduct, achieve deterrence, and preserve the integrity of the judiciary." *Id*. at *4. There are no less onerous sanctions that would achieve those objectives in this case.

Finally, the *TLS* case also involved a claim for misappropriation of trade secrets. *TLS*, 2018 WL 3673090. There, the Court entered a default judgment against Defendants for permanently erasing electronically stored information and lying about it under oath. *Id*. at * 8. This Court made the following assessment of the facts which justified its decision:

> Defendants knew they had data relevant to this lawsuit, and spent years resisting its discovery. Resistance failing, they systematically destroyed the places that data was stored. Defendants took extraordinary steps to disguise that destruction, including lying under oath and permanently erasing data. This is more than ordinary wrongdoing. It is unacceptable. It is an assault on this Court's ability to find truth, to do justice. The sanctions imposed here have been earned.

*Id*. at *8. The Court's ruling in *TLS* did not deter these Defendants from attempting a similar scheme. These Defendants should meet at least the same fate as those in *TLS*, although there is room for a more severe punishment within the Court's inherent authority.

## CONCLUSION

Defendants have no one to blame but themselves. They have no fear of lying under oath, and they perpetrated a fraud on this Court, on the Circuit Court of Hinds County, and even on

their own lawyers. The Court must issue a sanction that protects the integrity of the judicial process and deters others from orchestrating these types of schemes. The only sanction that will accomplish those objectives is a default judgment against MCAM, Dr. Sullivan, McMillan, and Stevens. They earned it.

University of Mississippi Medical Center

By:   */s/ Robert V. Greenlee*
        Robert V. Greenlee, MSB No. 100638

**Counsel for UMMC:**
Robert V. Greenlee, MSB No. 100638
Robert V. Greenlee, Attorney At Law, P.A.
660 Lakeland East, Suite 200
Flowood, Mississippi 39232
Telephone: (601) 863-8221
Facsimile: (601) 863-8231
Email: robert@whitfieldlaw.org

Phil B. Abernethy, MSB 1023
Robert M. Frey, MSB 5531
Benjamin M. Watson, MSB 100078
Caroline B. Smith, MSB 105501
BUTLER SNOW LLP
1020 Highland Colony Parkway, Suite 1400
Ridgeland, Mississippi 39157
Telephone: (601) 948-5711
Facsimile: (601) 985-4500
Email: phil.abernethy@butlersnow.com
      bob.frey@butlersnow.com
      ben.watson@butlersnow.com
      caroline.smith@butlersnow.com

<u>**Certificate of Service**</u>

I do hereby certify that I have this day filed the above and foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This 12th day of March, 2021.

*/s/ Robert V. Greenlee*
Robert V. Greenlee, MSB No. 100638

57969137.v1