**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**UNIVERSITY OF MISSISSIPPI**                                   **PLAINTIFF**
**MEDICAL CENTER**

**V.**                           **CAUSE NO. 3:19-CV-459-CWR-LGI**

**SPENCER K. SULLIVAN, M.D.;**                     **DEFENDANTS**
**MISSISSIPPI CENTER FOR ADVANCED**
**MEDICINE, P.C.; LINNEA MCMILLAN;**
**KATHRYN SUE STEVENS**

## ORDER

Before the Court are Defendants' motions to set aside the default judgment. Docket Nos. 283, 285, 289, and 291. The matter is fully briefed and ready for adjudication.

### I.     Factual and Procedural History

The background of this case is well-known to the parties. A brief recitation of the relevant facts will suffice.

University of Mississippi Medical Center (UMMC) hired Defendant Dr. Spencer Sullivan in July 2014 to head its Hemophilia Treatment Center. Docket No. 181 at 3. As a condition of his employment, Dr. Sullivan agreed to refrain from taking or using patient information for his own benefit, including to solicit patients for his own independent practice. Docket No. 1-3 at 9, 12-13. In January 2016, however, after gaining access to UMMC's confidential financial information, Dr. Sullivan contacted his lawyer and arranged to start his own for-profit hemophilia clinic and pharmacy. Docket No. 181 at 4. He incorporated this business as the Mississippi Center for Advanced Medicine, P.C. (MCAM). Docket No. 1-25 at 23-39.

Over the course of the next few months, Dr. Sullivan coordinated with other UMMC staff— for present purposes, Defendants Linnea McMillan and Kathryn Sue Stevens—to prepare for

MCAM's opening. This included compiling UMMC patient records. Docket No. 181 at 4. While still employed at UMMC, Defendants organized a spreadsheet containing patient information, such as each patient's birthdate, diagnosis, prescriptions, dose and frequency, insurance, pharmacy, and home and mobile telephone numbers, which they referred to as "the List." *Id.* at 1, 4. When Dr. Sullivan departed UMMC's employment on June 30, 2016, UMMC alleges that he left armed with this classified patient information, in violation of his employment agreement. *Id.* at 5. The use of this information, UMMC contends, enabled Dr. Sullivan to generate "$5 million of gross revenue from [prescriptions], of which Dr. Sullivan reported more than $1.1 million as personal income." *Id.*; *see also* Docket No. 180-7.

UMMC filed suit in Hinds County Circuit Court alleging state law claims against Dr. Sullivan on July 14, 2017. Docket No. 180-9. Over the course of the state lawsuit, Dr. Sullivan and other MCAM employees, including McMillan and Stevens, continually denied taking or using the List or other patient information from UMMC. Docket No. 181 at 6-12.

Then, in June 2018, the *Clarion-Ledger* published an article about the alleged theft of patient information from UMMC. *Id.* at 5. The article sparked a major shift in the litigation. Upon reading the account, McMillan's ex-husband contacted UMMC's counsel to notify them that he had obtained a list from his ex-wife's car that resembled the List described in the article. *Id.* at 5-6. UMMC confirmed that it was the List. *Id.* at 6.

UMMC filed the present federal lawsuit on June 28, 2019, alleging claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2) and (a)(4), and the Federal Trade Secrets Act, 18 U.S.C. §§ 1832(a)(5), 1836, and 1839. Docket No. 1.

Initially, even when faced with the copy of the List recouped from McMillan's ex-husband, Defendants denied taking, possessing, or using it. Docket No. 181 at 6. That changed in March

2020. Then, Defendant Rachel Harris "hired her own independent counsel, and produced 1,469 pages of previously unproduced text messages." *Id.* at 14. These messages directly contradicted Defendants' testimony. *Id.* This prompted UMMC to submit a request for admission to Harris, to which she "admitted that she, Stevens, McMillan, and Dr. Sullivan all possessed and used the UMMC Patient List at MCAM, and that she lied in her deposition." *Id.* at 15. UMMC then settled its claims with Harris. *See* Docket No. 94.

The pages of text messages proved to be a treasure trove and put UMMC on the path to finding the truth. UMMC filed a motion for default judgment against all remaining Defendants on March 12, 2021. Docket No. 180. It contended that McMillan, Stevens, and Dr. Sullivan committed perjury. Docket No. 181 at 20-23. UMMC further alleged that Defendants engaged in spoliation of evidence by destroying the List and other patient records that Defendants allegedly stole from UMMC. *Id.* at 23-27. UMMC emphasized that in response to requests for production in this federal lawsuit, Defendants falsely claimed that no patient List or other patient records from UMMC existed. *Id.* at 14. This, UMMC claimed, amounted to concealment of evidence. Consequently, UMMC requested that this Court exercise its inherent power and impose a default judgment against each of the defendants.

Additional briefing followed. On July 22, 2021, UMMC sought leave to file a supplemental brief and exhibits in support of its motion for default judgment. Docket No. 232. The supplemental brief concerned Dr. Sullivan's admission that he possessed two external hard drives containing information taken from UMMC. Docket No. 232-6 at 2. Defendants did not oppose UMMC's motion. Docket No. 237. The briefing detailed production of the erstwhile missing hard drives.

On April 21, 2021, the Magistrate Judge issued an Order granting in part UMMC's motion to compel production of the hard drives. Docket No. 194. This Order put Dr. Sullivan to a choice:

produce all external hard drives used to store UMMC information, or else, permit forensic examination of his desktop computer. *Id.* at 7. On April 26, 2021, Dr. Sullivan responded to the Order, through his counsel, by contacting the Magistrate Judge to arrange for production of "a hard drive and a thumb drive." Docket No. 208-2. Dr. Sullivan's admission contradicted his prior testimony and interrogatory responses. Docket No. 234-4 at 179-80, 650. In connection with this admission, on August 26, 2021, Dr. Sullivan submitted errata correcting his deposition testimony of April 14 and 15, 2021. Docket No. 232-6. There, Dr. Sullivan admitted to retaining a hard drive containing files and emails from UMMC. *Id.*

On October 8, 2021, the Court entered an Order granting UMMC's motion for default judgment. Docket No. 273. In its analysis, the Court considered the supplemental briefing attached as an exhibit to UMMC's outstanding motion [Docket No. 232].

Defendants timely moved to set aside the default judgment. Docket Nos. 283, 285, 289, and 291. The motions raise two lines of argument: First, that the Court committed a due process violation by considering information contained in UMMC's proposed supplemental briefing prior to Defendants' response to the briefing. And second, that the traditional factors concerning when to set aside a default judgment weigh in favor of setting aside the default judgment here. The Court considers each line of argument in turn.

## II.    Legal Standard

Federal Rule of Civil Procedure 55(c) states that a district court "may set aside an entry of default for good cause, and it may set aside a final default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c). Federal Rule of Civil Procedure 60(b) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the followings reasons:

      (1) mistake, inadvertence, surprise, or excusable neglect;

      (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

      (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

      (4) the judgment is void;

      (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

      (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

The guidepost for setting aside a default judgment is whether "good cause" exists. *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000). Such a determination turns on equitable principles. *Id.* When undertaking this analysis, courts in the Fifth Circuit consider three factors: "(1) whether the default was willful; (2) whether setting aside the default judgment would prejudice Plaintiffs; and (3) whether [the defendants] presented a meritorious defense." *In re Chinese Manufactured Drywall Prods. Liabl. Litig.*, 742 F.3d 576, 594 (5th Cir. 2014).

This list of factors is not exhaustive. *Id.* Other factors that a court may consider include "whether: (1) the public interest was implicated, (2) there was a significant financial loss to the defendant, and (3) the defendant acted expeditiously to correct the default." *Matter of Dierschke*, 975 F.2d 181, 184 (5th Cir. 1992). "The burden of showing good cause lies with the party challenging the default entry." *Sindhi v. Raina*, 905 F.3d 327, 332 (5th Cir. 2018) (citing *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 64 (5th Cir. 1992)).

These factors are disjunctive. *Dierschke*, 975 F.2d at 184. Indeed, they often cut against each other. "On one hand, [courts in the Fifth Circuit] have adopted a policy in favor of resolving cases on their merits and against the use of default judgments. On the other, this policy is counterbalanced by considerations of social goals, justice and expediency, a weighing process that

lies largely within the domain of the trial judge's discretion." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015) (quotation marks and citations omitted).

## III. Discussion

### A. Due Process

The first issue is whether this Court violated Defendants' due process rights by ruling before they filed their response to supplemental briefing.

Defense counsel underscores that in their response to UMMC's motion for supplemental briefing, "Defendants notified the Court that they did not object [and] would 'respond to the supplemental brief once it [was] filed.'" Docket No. 284 at 10 (quoting Docket No. 237 at 1). But, the defendants stress, the Court considered the supplemental briefing in its Order granting default judgment, and thereafter granted the motion for supplemental briefing, without providing the defendants with an opportunity to respond. This, Defendants contend, violated Rule 15 of the Uniform Local Civil Rules. Docket No. 284 at 11. It also, Defendants claim, amounted to deprivation of due process. *Id.*

UMMC contests this account. Legally, UMMC argues, Rule 15 was inapplicable to the motion for supplemental briefing, as "that rule governs amended and supplemental 'pleadings,' not motions." Docket No. 308 at 4. Practically, UMMC submits that Dr. Sullivan's subsequent filings before the Court provided him with adequate opportunity to explain his conduct. *Id.* at 5-6. In UMMC's account, these explanations did not justify Dr. Sullivan's withholding of the hard drives. *Id.* at 6.

By its terms, Local Rule 15 applies to a "pleading." Rule 7 of the Federal Rules of Civil Procedure provides the following exhaustive list of pleadings: "(1) a complaint"; "(2) an answer to a complaint"; "(3) an answer to a counterclaim designated as a counterclaim"; "(4) an answer

to a crossclaim"; "(5) a third-party complaint"; "(6) an answer to a third-party complaint"; and "(7) if the court orders one, a reply to answer." UMMC's motion for supplemental briefing does not fall under any of these categories. Thus, by its plain language, Local Rule 15 does not apply to the plaintiff's motion.

That said, Dr. Sullivan's assertion that he lacked an adequate opportunity to respond to UMMC's supplemental brief raises due process concerns independent of Local Rule 15. Specifically, in the defendants' response to UMMC's motion for supplemental briefing, they indicated "that Defendants have no objection to UMMC filing the supplemental brief and its exhibits as attached to their Motion" and would "respond to the supplemental brief once it is filed." Docket No. 237 at 1. The Court nevertheless considered the supplemental briefing prior to granting the motion. Docket No. 284 at 10. The Court erred.

Dr. Sullivan's arguments are well-taken. He had no opportunity to formally respond to the supplemental briefing. To that end, the Court reviewed with fresh eyes the defendants' responses to UMMC's supplemental brief, as contained in his motion to set aside the default judgment. *See* Docket Nos. 284 and 309. The de novo review suggests that the default judgment remains warranted.

Dr. Sullivan's proffered justifications for failing to turn over the hard drives are unavailing.[1] For one, during his August 11, 2021 deposition, Dr. Sullivan remained evasive. Dr. Sullivan failed to provide a straightforward answer when asked whether he produced everything on the 32-gigabyte hard drive transferred to the desktop. *See* Docket No. 283-2 at 18. Dr. Sullivan

---

[1] Specifically, at his August 11, 2021 deposition, Dr. Sullivan claimed that he did not produce the hard drives due to the presence of "very personal, very private photos" on the devices. Docket No. 283-2 at 9. Note, however, that Dr. Sullivan admitted that he placed intimate photographs on the hard drives after he had already transferred information from UMMC onto the drives and *after* the UMMC litigation had commenced. *See id.* at 11. Given the timeline, Dr. Sullivan's concern regarding privacy seems more like a contrived, ad hoc rationale for his failure to comply with Court-ordered discovery.

not only admitted that he had knowingly lied about not knowing the location of the responsive hard drives; he also confessed that he kept the hard drives in one of his dresser drawers, which he opens daily. *See* Docket No. 283-2 at 6. It follows that accessing the drawer each day provided Dr. Sullivan with a daily reminder of the hard drives' existence, such that neither confusion nor inadvertence was responsible for Dr. Sullivan's failure to produce them. Dr. Sullivan also stated that he turned over the hard drives because he did not want to relinquish his computer, not because he wished to correct his prior false testimony regarding the hard drives. *Id.* at 14. This demonstrates willful noncompliance with his discovery obligations. The excuses offered by Dr. Sullivan fail to justify this noncompliance.

Now, having the benefit of Defendants' response to the supplemental briefing, the Court's failure to provide an opportunity for Defendants to respond constituted harmless error. Moreover, review of the memoranda and exhibits to Defendants' motions to set aside have remedied this error. A complete review of the available record, including Dr. Sullivan's justification for the falsehoods revealed in UMMC's supplemental briefing, indicates that the Court's error "did not affect the essential fairness" of the decision, especially now that that opportunity has been afforded. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984). Indeed, the Fifth Circuit has recognized that even "serious procedural irregularities during the course of a proceeding, without more, do not amount to a deprivation of due process." *Scott v. Carpanzano*, 556 Fed. App'x 288, 292 (5th Cir. 2014); *see also United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010); *Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204, 210 (5th Cir. 2003).

Fairness, not perfection, serves as the longstanding litmus test for judicial proceedings. *See Brown v. United States*, 411 U.S. 223, 231-232 (1973). The proceedings here satisfy that test. As such, due process considerations do not mandate that the Court set aside the default judgment.

**B.      Setting Aside a Default Judgment**

The Court next turns to the traditional standard for setting aside a default judgment. Each Defendant acted "expeditiously" to set aside the default judgment, *Dierschke*, 975 F.2d at 184, by timely filing their motions to set aside. Thus, below the Court considers (1) Defendants' willfulness, (2) potential prejudice suffered by UMMC in setting aside the default judgment, (3) the merits of Defendants' proffered defenses, (4) the public interest, and (5) Defendants' potential financial loss. The court is granted substantial discretion as to the weight afforded each factor. *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 64 (5th Cir. 1994).

**1.      Willfulness**

The body of law concerning willful defaults generally involves absentee litigants that frustrate the judicial process by failing to respond to litigation, not repeated fraud upon the Court. For instance, the Fifth Circuit has stated that "[a] willful default is an intentional failure to respond to litigation." *In re OCA, Inc.*, 551 F.3d 359, 370 n.32 (5th Cir. 2008) (quotation marks and citations omitted). "The defendant has the burden of showing by a preponderance of the evidence that its neglect was excusable, rather than willful." *Wooten*, 788 F.3d at 500-01 (citing *In re Chinese-Manufactured Drywall Prods.*, 742 F.3d at 494).

An intention "to 'play games' with the court" can evidence willfulness. *In re Chinese Manufactured Drywall Prods.*, 742 F.3d at 595 (quoting *Lacy*, 227 F.3d at 292). "[I]f a district court finds a defendant's default to be willful, then the district court need not make any other finding." *Jenkens & Gilchrist v. Groia & Co.*, 542 F.3d 114, 120 (5th Cir. 2008).

Willfulness can also take the form of a defendant's "flagrant bad faith and callous disregard of its responsibilities," thereby justifying "the district court's choice of the extreme sanction" of default judgment. *Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976). Put another

9

way, "dilatory and obstructive conduct" can warrant default judgment. *Smith v. Smith*, 145 F.3d 335, 344 (5th Cir. 1998).

The Court now evaluates each defendant's conduct in turn to determine whether it meets this willfulness standard.

As discussed above, throughout these proceedings, Dr. Sullivan continually lied, evading and stymying the parties' quest for the truth at seemingly every turn. His conduct was unrelenting. It meets the willfulness standard.

Next, the Court considers Stevens' behavior. At her June 9, 2020 deposition, Stevens admitted to lying during her January 25, 2019 deposition. *See* Docket No. 285-2 at 7-8. By the time Stevens recanted, litigation had been ongoing for nearly three years. Even then, she remained evasive in her responses. *Id.* at 8. For instance, when asked whether Dr. Sullivan asked her to bring a copy of the List to MCAM, she replied "'I don't recall.'" Docket No. 285-2 at 22-23. She similarly answered "'I don't recall,'" when asked about the content of the conversations regarding the destruction of the List. *Id.* at 25. This, despite Stevens' testimony that the destruction of patient visit notes from UMMC was the only time McMillan informed her that she had shredded documents, notwithstanding Stevens' observation that MCAM staff shred documents daily. *Id.* at 36. Since McMillan's conversation with Stevens regarding the destruction of the documents from UMMC was an anomaly in the context of MCAM's general document shredding procedures, it strains credulity that Stevens does not remember anything about this discussion.

Stevens also ultimately claimed that her dishonesty regarding the List's production and retention at MCAM was due to "'devotion to Rachel [Harris].'" *Id.* at 10. Though she emphasized that she did not participate in the shredding firsthand, Stevens did admit to contemporaneous knowledge of McMillan's destruction of other documents from UMMC. *Id.* at 34. Note that

Stevens still claimed that she did not know who destroyed the List, only that she knew "'it was destroyed.'" *Id.* at 25. Viewed in the context of the complete record, these responses reflect regret over getting caught in a lie, not a commitment to truthfulness. Stevens' deception was willful and significant.

McMillan also challenges the default judgment on several grounds. While admitting that she lied, McMillan argues that failure to truthfully answer UMMC's interrogatories and deposition questions does not justify the default judgment. Docket No. 290 at 7-8. McMillan also argues that considered on its own, her conduct does not justify the imposition of a default judgment. *Id.* at 8-11.

UMMC refutes this characterization of McMillan's conduct. It argues that McMillan "has now submitted a false Declaration to the Court," Docket No. 312 at 4, by attesting that when she delivered her first deposition, she had not disclosed her use of the List to her attorneys, MCAM, or Dr. Sullivan, when in actuality, MCAM and Dr. Sullivan knew of her use of the List. *Id.* at 9 (citing to Docket No. 289-3 at 2). In the Declaration, UMMC contends, McMillan also lied about the spoliation of evidence, the reason for her perjury, and not having a financial interest in patients. *Id.* at 11-15.

On review, the Court finds that McMillan's fraudulent behavior warrants default judgment. As with Stevens, McMillan effected significant dishonest acts upon the judicial process. Regarding destruction of the patient records and other documents taken from UMMC to MCAM, McMillan testified that, despite being aware of the pending lawsuit, she did not preserve the records because she "'didn't know [she] needed to.'" Docket No. 289-2 at 29. Though she admitted to shredding patient documents taken from MCAM in her Declaration, she still claimed that "it was not [her] intention to destroy evidence." Docket No. 289-3 at 3. Yet destroy evidence she did. Such

destruction is egregious given Stevens' testimony during her June 9, 2020 deposition that McMillan did not ordinarily notify Stevens when she shredded papers, yet McMillan did so after shredding the face sheets and visit notes taken from MCAM. *See* Docket No. 285-2 at 34, 36. This discussion indicates that McMillan knew that her destruction of the documents from UMMC was noteworthy. Such circumstances justify entry of the default judgment.

Finally, the Court turns to MCAM. Defense counsel contends that the Court imposed "default judgment against MCAM based on a single act." Docket No. 292 at 2. They also object to sanctions on the basis that MCAM initially filed the false statement in state court.

UMMC refutes Defendants' arguments on two grounds: first, that MCAM perpetrated fraud in this action distinct from that of the individual defendants; and second, that MCAM is vicariously liable for the deception of its CEO and employees, as these acts fell within the scope of employment of these individuals and benefitted MCAM. For instance, UMMC emphasizes "that MCAM, through Dr. Sullivan, had possession of not one but two responsive hard drives" containing information taken from MCAM. Docket No. 314 at 9.

As a threshold matter, the Court finds MCAM's second line of argument regarding the irrelevancy of the state court filing unpersuasive. In failing to correct the lies in its filing in the state court action when it submitted that same response as an exhibit in the federal action, Defendants engaged in fraud upon this Court. The Second Circuit's approach is instructive, as it recognizes that "sanctions may be warranted even where bad-faith conduct does not disrupt the litigation before the sanctioning court." *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 145 (2d Cir. 2012).

MCAM's objections to the vicarious liability rationale are also unconvincing. In the context of the law of agency and the Court's inherent sanctioning power, "[t]he federal courts have

12

recognized that a court may, pursuant to its inherent powers, impose a sanction upon a partnership based upon its vicarious liability for a partner's litigation misconduct." *Barrett v. Jones, Funderburg, Sessums, Peterson & Lee, LLC*, 27 So.3d 363, 371 (Miss. 2009) (collecting cases). Further, as recognized by the Fifth Circuit:

> A corporation can only act through its officers and directors. When one person owns a controlling interest in the corporation and dominates the corporation's actions, his acts are the corporation's acts. Allowing the corporation to recover for the owner's fraudulent or dishonest conduct would essentially allow the corporation to recover for its own fraudulent or dishonest acts.

*Matter of World Hospitality Ltd.*, 983 F.2d 650, 652 (5th Cir. 1993). The approach of courts in sister circuits is also instructive. As aptly put by the U.S. District Court for the Northern District of Illinois, "[w]hen a corporate party's upper management engages in sanctionable conduct in litigation, the corporation itself must bear the consequences." *Flextronics International, USA, Inc. v. Sparkling Drink Systems Innovation Center, Ltd.*, 230 F. Supp. 3d 896, 912 (N.D. Ill. 2017).

As the President and CEO of MCAM, Dr. Sullivan is an officer of the corporation. His dishonesty directly benefitted MCAM. For instance, Dr. Sullivan and another officer not party to this lawsuit, Jordan Robinson,[2] directed Harris to destroy information taken from UMMC to MCAM "in late 2016." Docket No. 307-1 at 56. Even Dr. Sullivan's failure to turn over the hard drives, which he sought to explain based on concerns pertaining to intimate personal privacy, related to information misappropriated to enrich MCAM. On this set of facts, it is appropriate to impute Dr. Sullivan's dishonesty to MCAM. Given MCAM's own, separate fraudulent representation in this action, *see* Docket No. 180-32 at 2, MCAM no less than the defendants who are natural persons deserves a default judgment.

---

[2] In a November 2, 2021 declaration, Robinson identified himself as the Vice President and Chief Operating Officer of MCAM. Docket No. 283-11 at 1.

In sum, the record underscores the brazen nature of Defendants' conduct. Each defendant perpetrated dishonesty upon the Court. Their conduct is far more egregious than evading service of process to avoid being haled into court. These defendants used the court system itself to perpetuate fraud through lying, obstructing, concealing, and destroying evidence. Their acts may have never been uncovered, but for one of them finally deciding to tell the truth—something our judicial system demands. There can be but one conclusion: these acts satisfy the willfulness prong. Under this metric, Defendants' actions justify the default judgment against each defendant.

### 2.    Prejudice

In the context of a default judgment, "mere delay does not alone constitute prejudice." *Lacy*, 227 F.3d at 293. Rather, "the plaintiff must show that the delay will result in the loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion." *Id.* (quoting *Berthelsen v. Kane*, 907 F.2d 617, 621 (6th Cir. 1990)).

Defendants contend that setting aside the default judgment will not prejudice UMMC. Specifically, MCAM contends that the defendants have corrected their prior lies, thereby curing any prejudice suffered by UMMC. *See* Docket Nos. 284 at 21-22; 288 at 10-12; 290 at 11-13; 292 at 12-14. UMMC disagrees. Pointing to the pattern of dishonest acts by Defendants, UMMC argues that setting aside the default judgment will prejudice it by providing the defendants with an additional opportunity to collude in fraudulent conduct.

The Court agrees with UMMC. UMMC has already shown that Defendants' conduct has caused increased difficulties in discovery. And Defendants' established practice of dishonesty establishes the likelihood that setting aside the default judgment would result in "greater opportunities for fraud and collusion" in the current case. *Lacy*, 227 F.3d at 293 (citation and

quotation marks omitted). Such risk further prejudices UMMC. Accordingly, the prejudice factor weighs against setting aside the default judgment.

### 3.    Meritorious defense

"A district court has the discretion not to set aside a default judgment if the defendant 'fails to present a meritorious defense sufficient to support a finding on the merits' in its favor." *Scott v. Carpanzano*, 556 F. App'x. 288, 296 (5th Cir. 2014) (quoting *Lacy*, 227 F.3d at 293). The key inquiry is "whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." *In re OCA, Inc.*, 551 F.3d 359, 373 (5th Cir. 2008) (citation and quotation marks omitted).

Defendants claim that they can offer a meritorious defense to UMMC's Defend Trade Secrets Act (DTSA) claim.[3] The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836. Under the statute, "'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and
(B) the information derives independent value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

---

[3] On December 10, 2021, UMMC filed a motion to dismiss its conspiracy claim under the DTSA [Docket No. 326], which the Court granted on December 13, 2021, resulting in dismissal of Count Five of UMMC's Complaint. Consequently, UMMC's only remaining claim under the DTSA is for misappropriation of trade secrets.

15

*Id.* § 1839(3). In relevant part, the statute defines "'misappropriation'" as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 1839(5)(A). Further, "'improper means' . . . includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy . . . ." *Id.* § 1839(6)(A).

Defendants specifically argue that UMMC "must present legally sufficient evidence that the alleged misappropriation—rather than other factors—actually caused the alleged harm or unjust enrichment." Docket No. 284 at 13. Defendants observe that in the Fifth Circuit, "the 'required causal link must be proved as a matter of fact and with a fair degree of certainty'—and with an even 'tighter connection' between the challenged conduct and alleged damages if the damages are potentially attributable to other identifiable causes." *Id.*

UMMC submits that Defendants' dishonesty compromised their meritorious defenses. *See* Docket No. 308 at 17. They also contest the veracity of the patient affidavits upon which Defendants rest their defense. *Id.* at 19. Finally, UMMC urges that the patient letters do not support Defendants' causation defense. *Id.* at 25.

Upon careful review, Defendants' meritorious defense arguments also fail to justify setting aside the default judgment. The record establishes that the patient information at issue constituted a trade secret under the DTSA. *See* Docket No. 317-1 at 4. The record then establishes that Defendants took without authorization these trade secrets, and then lied about their conduct, repeatedly, under oath. The justifications Defendants offer for their conduct do not detract from its unlawfulness. Finally, Defendants' arguments regarding UMMC's inability to recover under a theory of unjust enrichment is more appropriately handled at the damages stage, not the liability stage. The meritorious defenses factor, then, offers no grounds for disturbing the default judgment.

### 4.    Public interest

Defendants then urge that the public interest weighs in favor of setting aside the default judgment. They contend that "MCAM serves a significant patient population across Mississippi who will have to find other care providers if default judgment forces MCAM to close." Docket No. 284 at 29. Indeed, Defendants underscore that "MCAM serves an area of the country that suffers from extremely low access to health care." *Id.* at 30. Lack of access is particularly acute for children with specialized medical conditions. *Id.* Thus, Defendants argue that upholding the default judgment will adversely impact the public.

UMMC disputes this account. In relevant part, UMMC stresses "that MCAM's 79 active hemophilia patients typically do not visit MCAM more than 1 to 2 times a year and thus account for less than 1%" of patient visits each year. Docket No. 308 at 31. Thus, UMMC argues, "[a]ny judgment against Dr. Sullivan or MCAM will not affect the ability" of the doctors who treat the other 99% of patients to continue their service, "whether it be at MCAM or elsewhere." *Id.*

On balance, the Court finds UMMC's arguments on this point convincing. Defendants' concerns regarding MCAM's patients' ability to access medical care are well-taken. It is a shame that Defendants failed to consider these effects prior to engaging in fraud upon the Court. As it is, the public interest in deterring dishonest acts upon the Court outweighs the potential social costs of MCAM's closure—which, as explained below, is not a foregone conclusion even if the default judgment remains undisturbed.

### 5.    Financial Loss to the Defendants

Defendants last raise their potential liability of "$20.9 million in unjust enrichment damages" as grounds for setting aside the default judgment. Docket No. 284 at 27. This argument, too, though, is unavailing. As acknowledged by defense counsel, "the Court imposed default

judgment as to liability only." *Id.* The actual measure of damages at this time is purely speculative. Consideration of the potential, not the actual, financial liability faced by Defendants is thus premature, and does not bear on the above analysis.

Defendants contend that "[t]he Fifth Circuit has deemed losses in the hundreds of thousands and low millions sufficiently significant to support setting aside a default judgment." Docket No. 284 at 26. But in each of the cited cases, the court considered the willfulness of the party against whom the court entered a default judgment *prior* to weighing the financial burden. Only after finding that the defendants did not behave willfully did the courts weigh the parties' potential financial liability.[4] Applying the same analysis to the instant case, the magnitude of potential sanctions does not outweigh the severity of Defendants' willful misconduct. Hence, Defendants' potential financial loss does not justify setting aside the default judgment.

### C.    Alternative Sanctions

Finally, each of the defendants also offers alternative sanctions. For example, in lieu of the default judgment, Dr. Sullivan submits that he can "compensate UMMC for the costs of his conduct," *i.e.*, the costs of his depositions. Docket No. 284 at 22. UMMC counters that such a course of action would enable Dr. Sullivan "to buy his way out of perjury while also providing him with the unmatched tactical advantage of having multiple versions of the facts to pick and choose from at trial." Docket No. 308 at 34. The other defendants similarly offer to compensate

---

[4] *See In re OCA, Inc.*, 551 F.3d 359, 374 (5th Cir. 2008) (finding that the record did not necessitate a finding of willfulness on the part of the party against whom the court entered a default judgment); *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. Unit A. Jan. 1981) (emphasizing the inappropriateness of default judgment where it was "clear from the record" that the parties subjected to the default judgment "did not in fact have an opportunity to present their side of the controversy," and that "the full merits of the cause were not examined"); *Jenkens & Gilchrist*, 542 F.3d 144, 124 (5th Cir. 2008) (underscoring that the record failed to "conclusively" demonstrate that the party's "default was willful); *Scott v. Carpanzano*, 556 F. App'x. 288, 299 (5th Cir. 2014) (vacating the monetary portion of the default judgment entered against one of the three defendants due to lack of willfulness, but affirming it with respect to the other two, "since the former willfully defaulted and the latter failed to present a meritorious defense").

UMMC for the costs associated with their dishonest acts in this proceeding. *See* Docket Nos. 385-3 at 3; 289-3 at 3; 292 at 14. As with Dr. Sullivan's offer, UMMC argues that these alternative sanctions fail to adequately account for Defendants' misconduct or deter future litigants tempted to lie to the Court. *See* Docket Nos. 310 at 27; 312 at 17; and 314 at 20.

  "Discovery in civil litigation takes place largely on faith—the faith that each party will voluntarily provide all relevant and responsive evidence to its opponent, even when that evidence is prejudicial to the producing party's case." *Balancecxi, Inc. v. International Consulting*, No. 1:19-CV-0767-RP, 2020 WL 6886258, at \*13 (W.D. Tex. Nov. 24, 2020), *report and recommendation adopted*, 2021 WL 21949001 (W.D. Tex. 2021). The defendants evaded this core tenet of civil litigation. As articulated in the Court's earlier Order, Defendants' misconduct was brazen and constant. *See* Docket No. 273 at 12-13. Alternative sanctions are indeed insufficient.  As UMMC puts it, insufficiently punished, Defendants are "laying down a blueprint for fraud in the Southern District of Mississippi." Docket No. 308 at 1. The lesser sanctions proffered by Defendants fail to account for the magnitude of Defendants' misconduct or sufficiently deter similar conduct by future litigants. *See e.g.*, *Balancecxi*, 2020 WL 6886258, at \*13 (emphasizing that severe sanctions, including default judgment, are justified in certain circumstances, such as when parties intentionally destroy evidence, "as civil litigants must know that actions such as these will not be tolerated, lest more parties engage in them"). As this Court has explained: "A court does justice by finding truth. That search requires evidence. Intentionally destroying evidence, then is more than a devious litigation strategy. It is a lethal attack on a court's purpose, and must be responded to in kind." *TLS Mgt. & Mktg Serv., LLC v. Mardis Financial Services, Inc.,* 2018 WL 3673090, at \*1 (S.D. Miss. Jan. 29, 2018).

  Default judgment therefore is the appropriate sanction.

## IV.     Conclusion

Defendants' motions to set aside the default judgment are denied. The parties have preserved their arguments on this matter for appellate review. The trial on damages remains stayed pending the Court's ruling on the remaining outstanding motions.[5] Further, the stay on UMMC's response to the defendants' motion for summary judgment [Docket No. 306] is hereby lifted, such that UMMC's response is due in 21 days. Defendants will then have 14 days to file their rebuttal.

SO ORDERED, this the 1st day of February, 2022.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[5] Upon review of the filings in this case, the Court notes that UMMC's complaint contained a demand for a jury trial. *See* Docket No. 1 at 53. As such, absent an agreement to a bench trial by the parties and the Court concurring, the trial on damages will take place before a jury.